**Charlie MINITEE**

v.

**Patricia HARRIS, Secretary of Health and Human Services**

**No. Civ. 80–1238.**

United States District Court,
D. New Jersey.

Nov. 25, 1980.

Freeman & Bass by Kenneth Walker, Newark, N. J., for plaintiff.

Robert J. Del Tufo, U. S. Atty. by Anne Singer, Asst. U. S. Atty., Newark, N. J., for defendant.

MEMORANDUM

BIUNNO, District Judge.

Minitee filed application for disability insurance benefits on September 15, 1978, claiming a disability onset of September, 1978 (Exh. 1, Tr. 59–62). The onset date was amended to September, 1968, 10 years before (Exh. 2, Tr. 63).

His work history shows various kinds of employment from 1928 through 1968, such as farm work, factory work, janitor, machine operator, painter, construction labor and truck driving, as well as military service from 1941 to 1945 in the Army as a truck driver (Exh. 18, Tr. 105). (Tr. 37–42).

On about October 5, 1968 he was injured by a gunshot wound in the lower right abdomen, and as a result wound up at Martland Medical Center where he stayed about a month. He did not regain consciousness for 4 or 5 days after admission, underwent surgery during which one kidney was removed, and after discharge went to the clinic as an outpatient (Tr. 41–43).

The only written record of this confinement and later outpatient treatment is a typed note of the N. J. College of Medicine and Dentistry, Martland Hospital Unit, signed by Troadio L. Soriano, Jr., M.D., addressed "To Whom It May Concern," and undated. The text indicates the note was prepared while Minitee was a clinic outpatient, as it certifies that he was in the hospital from October 5, 1968 to November 4, 1968, and that: "Presently, he is being followed in our Surgical Clinic."

It goes on to say that he underwent an exploratory Laparotomy and Nephrectomy for gunshot wound in the abdomen, and that after surgery the remaining kidney was found to have nephrosclerosis "which lengthened his recovery considerably". It then states the opinion that his health "will not allow him to hold a permanent job." (Exh. 17, Tr. 104). He was then a month or so beyond his 50th birthday (Exh. 1, Tr. 59).

This is the only written material reflecting his 1968 hospital stay and outpatient clinic treatment that followed. There is no admission record, no reports of laboratory tests, no daily notes, no discharge summary and no record of clinic visits and contemporary test results.

He has been receiving a Veteran's Administration pension for non-service connected disability since 1969. (Tr. 36–37), and said he filed for Social Security sometime after he filed for the pension, and was denied. After discussion about a search for the record of application and denial, and the comment that the record might have administrative finality for an earlier onset date (Tr. 49–50), it was left at the close of the hearing for counsel to decide whether he wished to have a search made for the earlier application, which might contain the records of the hospital and raise a serious question of res judicata; the record was kept open for submission of hospital records and a request to search for the record of the earlier application, with the attorney to let the ALJ know definitely. (Tr. 57–58).

After the hearing of August 22, 1979 (Tr. 26), a reminder was sent October 16, 1979 allowing two more weeks and if nothing was heard the record would be closed (Tr. 17). The decision was issued November 7, 1979 (Tr. 11–16), with nothing further submitted or requested.

A request for review was submitted January 3, 1980, the form noticing that additional evidence was to be attached or forwarded within 15 days or any extension thereof. (Tr. 9–10). The time for brief was set by letter of January 18, 1980 (Tr. 8) and it was submitted within time, noting that no 1968–1969 hospital records had been located (Tr. 6–7). The ALJ decision was determined to stand as the final decision of the Secretary by action dated April 2, 1980 (Tr. 3–4) and the present suit under 42 U.S.C. § 405(g) followed.

Minitee last met the earnings requirement for disability purposes on March 31, 1972 (Tr. 29). Between the note of Dr. Soriano, evidently written while Minitee was a clinic outpatient after his hospital discharge of November 4, 1968, and several visits to Martland Hospital in 1977, there are no medical or clinical records whatever. An emergency department record shows ar-

rival on August 17, 1977 at 11 PM with a diagnosis of hypertension (Exh. 7, Tr. 80), and another arrival on November 11, 1977 at 1:00 PM after a fall the night before (Exh. 8, Tr. 81). A radiology report of the same date reflects a fracture of the 8th, 9th and 10th left ribs. It also notes a foreign body (bullet), and he was discharged November 15, 1977 as "not in distress" (Tr. 82, 83).

A September 8, 1977 record of the Martland Medical Clinic reports a visit because of low back pain. It recites a history of a right nephrectomy in 1968 as the result of a gunshot wound, with the bullet still in his back, too close to the spinal cord to remove. It also recites abdominal surgery in 1976 as the result of a mugging and carries a sketch of the two surgical scars. He was prescribed Esidrix, phenobarbital and Valium. His blood pressure was 155/120 (Tr. 85).

A later clinic report of October 20, 1977 shows the blood pressure down to 140/100, and modifies the prescription. A return call was scheduled in 2 months (Tr. 84). Before then, he was back· with the fractured ribs mentioned above, on November 11, 1977.

Aside from the Martland records from August into November, 1977, there are no medical records at all, even in respect to the 1976 abdominal surgery due to a mugging.

There are diagnostic medical reports from later examinations. One of these, dated September 8, 1978 (a neuropsychiatric examination) is evidently in connection with a worker's compensation claim (see Tr. 56) as it refers to employment by Mack Jacobs and says that Minitee was employed by "respondent" 3 years until 1968 and exposed to dust, fumes, gases, noise, temperature changes, wetness, etc. The diagnosis is "neurological residuals of exposure to noxious fumes, dust and loud noise and traumatic anxiety psychoneurosis, also sciatic neuritis, attributable to accident at work and exposure at work," with an estimate of 100% disabled. The past history mentions excision of kidney, and the examination records blood pressure as 120/80. See Tr. 86.

Another report, September 8, 1978, is also in connection with employment by Jacobs and is evidently in connection with the worker's compensation claim. It makes no mention at all of the removed kidney, but focuses on exposure at work to dust, dirt, fumes, gases, noise, etc. It concludes that Minitee is "totally disabled" as a physiological unit, and advises medical and neuropsychiatric consultations. See Tr. 87.

An October 23, 1978 report, also is evidently in connection with the worker's compensation claim. This report concludes that a chronic bronchitis, causally related to exposure to dust, fumes and gases accounts for a permanent disability of 20% of total; a moderate hypertension accelerated or exacerbated by strenuous work efforts, accounts for a permanent disability of 20% of total. It then mentions the one kidney as "not functioning well" and that taking all three conditions, his overall disability is total (Tr. 97–98).

A report of March 6, 1979 evidently is another worker's compensation report in respect to "hearing". It estimates· a permanent disability for both ears of 45%, and for subjective symptoms of tinnitus and nasopharyngitis, 10% "permanent partial total" disability.

An eye examination resulted in a report of March 7, 1979, also in evident support of the worker's compensation claim. It shows 20/40 vision in both eyes without glasses and 20/25 corrected (with glasses). All other features are normal except for dilated blood vessels and corneal microscars. These two items are estimated as causing 22.5% "permanent partial total" disability. Tr. 101.

In sum, the medical or clinical evidence consists of the undated, but probably 1968 or 1969 note, the August-November, 1977 Martland clinic records (which the decision shows were obtained at the request of the Social Security Administration for all records from 1970 on), and the 1978–1979 examination reports in connection with the worker's compensation claim, still pending.

■ The case is accordingly one of failure of proof, and the finding of the ALJ that disability had not been shown to have begun on or before March 31, 1972, is supported by substantial evidence, especially since it includes a finding on credibility.

■ In other appeals, as well as in this one, the court has observed a tendency of claimants to rely on examination reports obviously prepared to support worker's compensation claims. They are, of course, admissible, but are not necessarily entitled to much weight because they are geared to entirely different statutory tests of disability than those applicable to claims as defined by section 223(d)(1) of the Act. It is also well and widely known that in worker's compensation cases the claimant's medical examination reports are met by like reports obtained by the employer's insurance carrier which, in a contested case, will reflect different evaluations. Despite the large volume of disability appeals, the court has not seen a single hearing record in which the employer's medical reports have been provided along with those obtained by the claimant.

The administrative processing of social security disability claims constitutes a difficult task because the procedures are intended to be as simple and informal as possible so that the claimant is not burdened with the expense of an adversary proceeding. Even at hearings, the ALJ is expected to be as helpful as possible to the end that valid claims may be approved. In this context, an ALJ can hardly be faulted for giving little weight to adversely prepared examination reports, obviously obtained to support a workers compensation claim (or, perhaps, an auto accident law suit), when they are selectively presented without the reports obtained by the employer or its carrier.

It may be prophylactic in such cases for the ALJ to ask for such contrary reports and to require their production. His task is difficult enough as it is, and ought not to be made more difficult by failure to produce all available medical reports.

At argument, the court reserved for further briefing on the question of the legal effect of an interruption of disability. In general, disability benefits allowable continue only so long as the disability continues. The answer provided, with which the Secretary agrees, is that under 20 CFR § 404.-116(e), any quarter which is part of a period of disability *established* for the individual making claim is not counted as part of the 40 quarter period used to determine fully insured and currently insured status.

The question was asked because the 1977 Martland clinic record did not show disability as defined by the Act, and since the gunshot and nephrectomy were in 1968, and the last date when the earnings requirements were met was March 31, 1972, it seemed that the subject of the question might provide an answer on the assumption that a statutory disability could be shown for 1978–1979.

As it turns out, it makes no difference in this case because in order to obtain the exclusion of any quarter from the 1968 incident and the March 31, 1972 expiration date, a statutorily defined disability would have had to be *established* between those dates.

In the common meaning of the term, Minitee was no doubt fully disabled while in the hospital for removal of the right kidney, for the clinical follow-up of a month or so after that, and possibly for some time beyond. But this is not the same as a statutorily defined disability, which must be the result of an impairment which can be expected to result in death, or which has lasted or can be expected to last for a *continuous* period of at least 12 months.

Since there was a failure of proof meeting this standard during the period October, 1968 through March 31, 1972, there is no excluded quarter in the 40 quarter count.

Submit order affirming the Secretary's final decision.