Arvon WINSTON, Plaintiff,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.

Civ. No. 83–3845.

United States District Court, D. New Jersey.

April 25, 1984.

William J. Scherman, Freeman & Bass, Newark, N.J., for plaintiff.

John W. O'Farrell, Asst. U.S. Atty., Newark, N.J., for defendant.

## OPINION

LACEY, District Judge.

Plaintiff Arvon Winston filed an application for disability insurance benefits on October 30, 1981 and for Supplemental Security Income (SSI) on November 1, 1981. Plaintiff claimed disability resulting from injuries sustained in a 1979 automobile accident. He claimed that the period of disability began in August 1980, when he was fired from his job. The application was denied initially and on reconsideration. A hearing was held on October 26, 1982. The ALJ, in a decision dated June 20, 1983, found that plaintiff's insured status had expired on December 31, 1982, and that plaintiff had not suffered any impairment that significantly limited his ability to perform work-related functions. The Appeals Council confirmed the ALJ's decision on September 22, 1983, rendering it the final decision of the Secretary. Plaintiff now seeks review of the Secretary's decision under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Disability is defined identically for the purposes of disability insurance and SSI benefits as inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). If the applicant is presently engaged in substantial activity, or does not have an impairment severe enough to limit significantly his ability to perform basic work activities, a finding of nondisability is justified. *See* 20 C.F.R. §§ 404.1520; 404.1526.

## MEDICAL EVIDENCE

The earliest medical evidence of record is a report from the Hospital Center at Orange, dated November 24 and 25, 1979. It shows degenerative disc disease at C5–6 of the cervical spine and mild levoscoliosis with degenerative disease at L1–2 of the lumbosacral spine. The doctor found tenderness, but no fracture or malalignment. Plaintiff's injuries were sustained in an automobile accident.

An outpatient report from Beth Israel Medical Center, dated January 8, 1981, noted narrowing of the disc space between C5 and 6, with anterior and posterior spur formation and subchondral sclerosis involving the lower half of C5. The doctor also noted the possibility of chronic bronchitis. A January 7, 1982 report from Beth Israel found narrowing of the intervertebral disc space at L4–5 on the left side with some reactive sclerosis in the lower portion of the body of L4. The radiologist also found slight scoliosis of the dorsal spine to the right and the lumbar spine to the left. He found some mild depression of the superior plate of L2 and osteophyte formation at the lower margin of L1. The diagnosis was mild scoliotic deformity, and degenerative changes in the lumbar spine.

Dr. Ahmad, an orthopedist, examined plaintiff on June 25, 1982. He diagnosed plaintiff as suffering from cervical and lumbosacral sprain, and fibromyositis. Flexion of the lower back was restricted 30 degrees, and extension 15 degrees. He noted tenderness and pain, particularly when bending or squatting. The report, apparently prepared with Workers' Compensation in mind, found 35% disability.

Dr. Choudhury examined plaintiff on October 26, 1982 at the request of defendant. The doctor found essentially that plaintiff could bend and function normally and without pain. He found only mild degenerative symptoms in the spine and narrowing of the C5–6 disc space. He stated that plaintiff did not have "any functional limitations in his musculoskeletal system." He did opine, however, that plaintiff should "nev-

er" carry more than 25 pounds, though the reason was not given.

Dr. J.C. Carr, plaintiff's treating physician after the accident, submitted a report dated December 16, 1980. He found continued headaches, pain and neck stiffness. Plaintiff showed multiple fine tremors. Romberg's sign was moderately positive. There was tenderness and muscle guarding of the neck, and tenderness over C-3 and 4. Neck motion was limited. Carr opined that there would be some permanent damage to the neck and nervous system. Plaintiff had made some 27 office visits to Carr between November 1979 and March 1980.

On December 22, 1981 Dr. Somberg performed a neurological examination at the request of defendant. The doctor found no limitation of motion of the cervical or lumbar spine, but did not elaborate beyond stating that plaintiff could touch his toes. Other than diminished sensation over the left half of the body, plaintiff showed no other abnormalities.

Dr. Pollock conducted a neuropsychiatric examination on June 24, 1982. Plaintiff complained of coughing, chest pains, back and neck pain, etc. The doctor found hyperactive deep tendon reflexes, tremors, depression of corneal and pharyngeal reflexes, and a positive Romberg test. He diagnosed "neurological residuals of exposure to noxious fumes and dust and loud noise, also sciatic neuritis, and traumatic anxiety psychoneurosis, attributable to exposure at work." [1] He estimated "permanent neuropsychiatric disability to be 25% of partial total."

Dr. Scannapiego, an ophthalmologist, examined plaintiff on June 28, 1982. He found chronic conjunctivitis, blepharitis and pingueculas of both eyes.

On June 28, 1982, Dr. Ghander, a specialist in otorhinolaryngology, examined plaintiff. He found a 35% hearing impairment, tinnitus, rhinosinusitis, and nasopharyngitis. He estimated a 7½% permanent partial total disability.

Dr. Hermele examined plaintiff on July 12, 1982. He found bronchovascular markings in the lower lung fields, extending outward with diffuse fibrosis and fibronodularities scattered throughout the mid and lower lung fields. He also found increased heart size and hilar vascular markings. The diagnosis was chronic bronchitis and pneumoconiosis, hypertension, and hypertensive cardiovascular disease. (Blood pressure was 150/100).

Dr. Dyer, a psychologist, examined plaintiff on November 8, 1982. He found as follows:

The severe angulation problems, perceptual rotations, fragmentations, and other gross distortions observed in this subject's Bender Gestalt Test record are suggestive of a very severe visual-motor integration problem associated with mental retardation, organic brain damage, or both conditions. The anxious overworking of dots, bizarre distortions, and compression of all figures into the upper left quadrant of the page were also suggestive of an emotional disorder. Total testing time was significantly above average at 10½ minutes.

The Wechsler Adult Intelligence Scale yielded a verbal scale IQ of 58. Cognitive and perceptual tests placed plaintiff below the first percentile. Woodcock-Johnson tests placed plaintiff below the first grade level in reading, applied problems, and written language. Dyer found that plaintiff was in the lower mildly retarded range. He opined that plaintiff could not do jobs requiring processing of information, reading, or other mental skills tested for.[2]

Plaintiff's medication form shows that he takes Lofressor twice a day for hypertension; Esidrix for kidney problems; Zaroxo-

---

1. There is no evidence as to what, if anything, in plaintiff's former work resulted in the claimed exposure.

2. Dr. Dyer's report, submitted after the hearing, was the first evidence of mental retardation.

The application had been based on injuries received in the car accident. The reports of Hermele and Chaudhory were also submitted after the hearing.

lyn for kidney problems; and Motrin for arthritis.

## PLAINTIFF'S TESTIMONY

Plaintiff was born in 1925. He claims to have received an eighth grade education. He testifies to extremely limited reading ability.

Plaintiff worked as a binder at Art Metals for some period of time until he was fired in August 1980. He previously worked for many years as a paint mixer. From August 1980 until May 1981 he received unemployment compensation. He states that he fell while on the job at Art Metals and injured his arm. He stated that he ordinarily uses a cane, and cannot walk longer than a short block. He testified that he could not sit longer than a half hour or stand longer than 10 minutes. He continues to visit Beth Israel Hospital once a month as an outpatient, for treatment of high blood pressure, arthritis, and miscellaneous symptoms.

Plaintiff testifies that he stays home most of the time. He owns a dog but does not walk it. He receives help in cooking, cleaning, dressing, etc. from a friend who lives downstairs.

## THE ALJ'S DECISION

The ALJ found that plaintiff had not suffered from a severe impairment before his insured status expired on December 31, 1982. The ALJ noted that plaintiff was taking only Motrin, a mild analgesic, for his back pain. He also found that plaintiff's failure to seek any medical treatment from August 1980 until January 1982 reflected negatively on the severity of his condition. The ALJ stated that plaintiff had returned to work after his 1979 accident until August 1980, the alleged onset date of his disability. The ALJ also relied on the reports of Drs. Somberg and Choudhury to support his statement that there were no "significant positive orthopedic and neurological findings." The ALJ dealt with conflicting evidence by stating that the "medical reports from Drs. Klein, Pollack, Ghander, Ahmad and Hermele ... which suggest that the claimant is permanently partially disabled are hereby rejected since they are apparently formulated in connection with state workmen's compensation proceedings governed by standards of disability which differ significantly from the definition of disability under the Social Security Act, as amended. The conclusion offered by Dr. Dyer ... that the claimant's psychological deficits would prevent him from performing [certain] jobs is irrelevant and moot since the claimant managed for many years to function adequately as a machine operator, binder, factory laborer and paint mixer."

Finally, the ALJ noted that plaintiff received unemployment compensation after the alleged onset of disability. In accordance with an Appeals Council guideline, the ALJ drew an inference that plaintiff was not disabled from that fact. The ALJ then concluded that plaintiff's date of disability, if any, was advanced until April 1981, when he ceased receiving unemployment benefits.

The ALJ's decision concluded with the following findings:

1. The claimant met the special earnings requirements of the Act on August 21, 1980, the date that the claimant stated he became unable to work, and continues to meet them through December 31, 1982, but not thereafter.

2. The claimant had the following impairments on or before December 31, 1982: status post cervical and lumbosacral muscle sprain.

3. The claimant's allegations of severe pain are not credible and such pain either in itself or in conjunction with other impairments was not of such severity as to constitute the claimant disabled within the meaning of the Act, on or before his insured status expired on December 31, 1982.

4. The claimant does not have any impairment or impairments which significantly limit the ability to perform basic work-related functions; therefore, the claimant did not have a se-

vere impairment, on or before December 31, 1982.

5. Since the claimant does not have a severe impairment, he was not under a "disability," as defined in the Social Security Act, at any time on or before December 31, 1982.

6. The claimant was not under a "disability" for purposes of Title XVI of the Social Security Act, as amended.

## STANDARD OF REVIEW

■ In reviewing the Secretary's decision, this court must determine whether there is substantial evidence in the record as a whole to support the Secretary's findings. 42 U.S.C. § 405(g) (Supp. V 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.1979). That standard is deferential, but not meaningless; the court "retains a responsibility to scrutinize the entire record and to reverse or remand if the Secretary's decision is not supported by substantial evidence." *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981). *Accord, Baerga v. Richardson*, 500 F.2d 309, 313 (3d Cir.1974), *cert. denied*, 420 U.S. 931, 95 S.Ct. 1135, 43 L.Ed.2d 403 (1975).

■ Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). *Accord, Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983). Substantial evidence may fall short of a preponderance, and the possibility of drawing two inconsistent conclusions from the record does not preclude a finding of substantial evidence in support of one. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); *Port Norris v. I.C.C.*, 697 F.2d 497, 502 (3d Cir.1982). But the evidence "must do more than create a suspicion of the existence of the fact to be established.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Port Norris, supra*, at 807, *quoting Labor Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). The substantial evidence standard applies not only to administrative determinations of basic facts, but to inferences drawn therefrom. *Reading v. Mathews*, 542 F.2d 993, 997 (7th Cir.1976); *Jolley v. Weinberger*, 537 F.2d 1179, 1181 (4th Cir.1976); *Reyes v. Secretary of Health, Education and Welfare*, 476 F.2d 910, 914 (D.C.Cir.1973); *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir.1972), *cert. denied*, 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1973).

■ I must also review the ALJ's decision for errors of law. *Nettles v. Schweiker*, 714 F.2d 833, 836 (8th Cir.1983); *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983); *Doran v. Schweiker*, 681 F.2d 605, 609 (9th Cir.1982); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir.1982); *Aubeuf v. Schweiker*, 649 F.2d 107, 112 (2d Cir.1981).[2a] The legal findings of the ALJ are not entitled to the deference given findings of fact. *Allison v. Heckler*, 711 F.2d 145, 147 n. 5 (10th Cir.1983); *Wiggins, supra*, 679 F.2d at 1389 & n. 3. Evidence cannot be "substantial," or even relevant, except in light of the correct legal standard.

## DISCUSSION

### A. *Workers' Compensation Reports*

Several of the medical reports submitted by plaintiff contradict the ALJ's conclusion that there were no significant negative

---

**2a.** *See Wallace v. Secretary of HHS*, 722 F.2d 1150, 1155–56 (3d Cir.1983) (remanding, in part because Secretary misapplied regulations); *Burnam v. Schweiker*, 682 F.2d 456 (3d Cir.1982) (same); *Fowler v. Califano*, 596 F.2d 600, 602 (3d Cir.1979) (decision of ALJ "fails to observe the appropriate legal standard"); *Farley v. Celebrezze*, 315 F.2d 704, 706 (3d Cir.1963) (ALJ's decision must have "reasonable basis in law"). Recent District Court cases have recognized outright our duty to reverse for legal error. *Axe v. Dept. of HHS*, 564 F.Supp. 789, 791 (E.D.Pa. 1983); *Curtin v. Harris*, 508 F.Supp. 791, 793 (D.N.J.1981). *Accord, Friedberg v. Schweiker*, 721 F.2d 445, app. at 447 (3d Cir.1983) (reprinting with approval the district court opinion).

neurological or orthopedic findings. The ALJ is permitted to accept some parts of the evidence and reject others. He must, however, consider all the evidence, and show some basis for discounting the rejected evidence. *See Stewart v. Sec'y of HEW*, 714 F.2d 287, 290 (3d Cir.1983); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981). The question, then, is whether the ALJ's ground for rejecting the reports in their entirety—that they were obviously prepared in connection with workers' compensation claims—is sufficient.

To be sure, workers' compensation law applies totally different standards from those under the Social Security Act. The use of such reports for Social Security purposes has thus been criticized in this district. *See Minitee v. Harris*, 510 F.Supp. 1216, 1218–19 (D.N.J.1980) (Biunno, J.). I agree that the doctors' ultimate conclusions, e.g., "7½% partial total disability," are grounded in a different statute and have no relevance to the Social Security Act. I also note that the reports rejected by the ALJ are exactly the kind of reports criticized in the *Minitee* case, which was argued by the same firm that represents plaintiff here. Indeed, Dr. Pollock's report duplicates verbatim a passage from an unattributed report quoted in the *Minitee* opinion. *See* 510 F.Supp. at 1218. I note also that the doctors' reports in the case of *Glover v. Heckler*, No. 83–3168, argued by the same law firm[3] and also before me today, duplicate Mr. Winston's reports in many respects. Echoing the language in *Minitee* and in Dr. Pollock's report in this case, Dr. Pollock in *Glover* found that plaintiff suffered from sciatic neuritis, traumatic anxiety psychoneurosis and "neurological residuals of exposure to noxious fumes dust and loud noise." The other reports, by virtually the same list of

doctors called upon by plaintiff in this case, also fall into a repetitive pattern.

An ALJ could rationally conclude that workers' compensation reports are in some cases less reliable, especially as to their ultimate conclusions on the plaintiff's ability to work. In this case, an ALJ could discount the reports based on internal inconsistency; the fact that the "exposure" to dust, loud noise, etc. is in no way documented; or conflicting reports from other doctors. To the extent that the workers' compensation legal standards are reflected in the doctors' findings, the reports are rendered less applicable to a Social Security proceeding.

■■■ I do not believe, however, that such reports may be totally ignored because they contain conclusory language suggestive of workers' compensation.[4] The reports also contain test results, medical diagnoses, and conclusions that are not, or should not be, related to any particular statutory standard. I note also that one of the reports rejected was that of plaintiff's treating physician. Such reports are ordinarily entitled to some weight. *Wallace v. Sec'y of HHS*, 722 F.2d 1150, 1155 (3d Cir.1983); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981). Evidence is not substantial if the ALJ fails to resolve a conflict with other evidence, "particularly certain types of evidence (e.g. that offered by treating physicians) ...." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983). The ALJ may legitimately reject medical testimony, but he must weigh it. The record is equivocal at best as to plaintiff's physical problems, but I find that the ALJ failed to weigh the evidence.

### B. *Mental Disability*

Mental disabilities are perhaps the most difficult to evaluate. *Stokes v. Schweiker*,

---

**3.** The firm is Freeman & Bass of Newark, New Jersey. Another Freeman & Bass case before me today, *Rosado v. Heckler*, No. 83–3050 contains medical reports from many of the same doctors. These, too, duplicate much of the language in the reports of the other cases, and apply Workers' Compensation standards.

**4.** Nor did *Minitee, supra,* suggest that an ALJ may do what was done here. To the extent that they are valid medical diagnoses, reports must be considered by the ALJ regardless of the original purpose for which they are prepared. The absence of the original opposing reports is not significant in my view, since the agency may adduce its own reports.

729 F.2d 932 (3d Cir.1984). The only psychological or psychiatric testimony offered was in plaintiff's favor. Dr. Dyer found mental retardation and serious emotional problems, based on test results reproduced in his report. Given the lack of contrary evidence, the temptation is strong to find that the ALJ impermissibly set his own expertise against that of the physician. *See Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir.1983); *Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir.1979). "Recently, this Court reversed an ALJ who ignored competent medical evidence regarding psychological disability in favor of his own contrary conclusion." *Wallace, supra*, 722 F.2d at 1154–55 (referring to *Van Horn, supra*). The ALJ dealt only with Dyer's ultimate conclusion as to plaintiff's inability to perform certain mentally taxing jobs. He discounted the observation as irrelevant and moot because plaintiff had worked before. The ALJ did not discuss, or even mention in his summary of evidence, Dyer's medical findings as to plaintiff's IQ, mental capacity, and emotional disorder. In fact a verbal IQ score of 58 falls within the standards of 20 C.F.R. Pt. 404, App. 1, § 12.05 (1983). Dyer applied the Wechsler test recommended in the regulations. (Where both the verbal and performance scores are obtained, the lower of the two is used. Id. § 12.00) The other tests administered placed plaintiff in the lowest percentile, well below the 2d percentile level specified in the Appendix. *Id.* Test reports are not, of course, irrebuttable. Other test reports, articulated doubts as to plaintiff's credibility or the validity of the testing process, etc.

may furnish substantial evidence for a contrary conclusion.[5]

The issue is a close one. The ALJ noted that plaintiff had worked, and test results may be evaluated in light of plaintiff's activities. 20 C.F.R. Pt. 404, App. 1, § 12.00. He did not state that he assumed that the condition was not of recent origin. There is no evidence to the contrary, however, and it seems extremely likely that plaintiff's level of intelligence has remained constant over the years. There would probably be a rational basis for the ALJ's discounting of the test results, and I probably would not remand on this ground alone. Since the matter must be remanded on other grounds, however, the ALJ should take the opportunity to deal more explicitly with the evidence of mental retardation and severe emotional problems.

### C. *Miscellaneous Issues*

Most of the other issues raised by plaintiff would be mooted or considerably altered by the ALJ's full consideration of the rejected medical reports. Subjective pain, for example, must be evaluated in light of plaintiff's credibility and the medical evidence. Thus I do not comment on it here.

■ Plaintiff claims that the ALJ failed to consider evidence from the period after December 31, 1982. While disability benefits flow only from a disability during the insured period, SSI benefits depend only on a current disability. I find no error in this regard. The ALJ's decision is consistent with a proper application of the standards for the two classes of benefits. Moreover,

---

5. Dr. Dyer's report does not, I believe, directly advert to Workers' Compensation standards. But Dr. Dyer's reports are frequently seen in the company of those of Drs. Ghander, Ahmad, Pollock, Hermele, and Klein. They share with those reports the feature of a routine conclusion (as opposed to a diagnosis) that need not be given much weight. As it happens, all three of the Social Security appeals before me today contain reports from Dr. Dyer. All three note that the "perceptual rotations, fragmentations, simplifications, integration problems, and other gross distortions observed in this client's Bender Gestalt Test record are suggestive of a very severe visual-motor integration problem ...."

All three state that "[b]ased on the above findings, it is felt that [plaintiff's] prospects for success would be virtually nil in any employment requiring complex oral communication, fine perceptual motor skills, rapid cognitive processing of large amounts of information, or basic reading, arithmetic, and written language skills. This would include virtually all administrative, secretarial, clerical, and computer related jobs."

Here, as in the case of the earlier reports, the ALJ need not credit the doctor's conclusion as to the ultimate issue of disability. But the doctor's diagnosis suffices to create a factual issue that should be addressed by the ALJ.

there is no proffered evidence in the record for the period after December 31, 1982, and plaintiff does not contend that his condition has worsened since then.

In light of the foregoing, and in accordance with an order filed this date, this matter is remanded to the ALJ for further proceedings.