William WILKERSON, Robert J. Gardner, William E. Smith, on behalf of themselves and all others similarly situated

v.

Louis W. SULLIVAN, M.D.[1] Secretary of Health and Human Services.

Civ. A. No. 84–2548.

United States District Court, E.D. Pennsylvania.

Aug. 25, 1989.

---

1. Dr. Sullivan is the third defendant to be named in this action. The others were his predecessors as Secretary of Health and Human Services. When a public office changes hands, the new office holder is automatically substituted as a party in any pending civil action where his predecessor was a party. *See* Fed.R.Civ.P. 25(d)(1).

Dean M. Beer, James M. Lafferty, Jonathan M. Stein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Richard J. Stout, Asst. U.S. Atty., Michael Leonard, Asst. Regional Atty., Dept. of Health & Human Services, Philadelphia, Pa., Sheila Lieber, John R. Tyler, Dept. of Justice, Civil Div., Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

This is a class action whereby the plaintiffs seek preliminary or permanent injunctive relief requiring the defendant ("the Secretary") to cease his purported policy of "nonacquiescence" and begin evaluating the claims of alcoholics for social security disability payments and supplemental security income payments under the standard announced and reaffirmed in Third Circuit case law. Plaintiffs also allege that the Secretary's current policies violate the 1984 Social Security Disability Benefits Reform Act, 42 U.S.C. § 421, note, and seek similar relief to bring the Secretary into compliance therewith.

The class consists of:

All individuals suffering from medically determined and significant alcoholism, who reside in the area encompassing the Third Circuit Court of Appeals, whose Social Security Disability Insurance benefits and/or Supplemental Security Income (SSI) benefits the Social Security Administration has considered or is presently considering denying or terminating on the basis that the alcoholism is not disabling.

*Wilkerson v. Bowen*, 828 F.2d 117, 120 n. 2 (3d Cir.1987).[2]

Inasmuch as this case implicates social security policies purely and uniquely, subject matter jurisdiction is conferred by 42 U.S.C. § 405(g) and 28 U.S.C. § 1361. *See Kuehner v. Schweiker*, 717 F.2d 813 (3d Cir.1983) *vacated on other grounds*, 469 U.S. 977, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984). Following are the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

*Findings of Fact*

To put this action in its proper context, one needs to understand the process by which applications for social security disability benefits or supplemental security income are processed.[3] A claimant first

---

2. This case has an unusually long and complicated procedural history. On November 3, 1986 (Docket Entry No. 52), this Court dismissed the complaint because all named plaintiffs had received their social security benefits and no one was left with standing to represent the class. With the opinion cited in the text, on October 16, 1987, the Third Circuit reversed that decision, holding that the named plaintiffs were and are adequate class representatives despite their receipt of benefits. Since that time, the parties engaged in extensive discovery, some of which required Court intervention.

Plaintiffs finally renewed their motion for injunctive relief on April 14, 1989 (Docket Entry No. 68). The Secretary responded with his own motion for summary judgment on June 14, 1989 (Docket Entry No. 73).

On June 16, 1989, a hearing was held on these motions. At that time, the Court ordered supplemental filings by the parties. This process was completed on August 11, 1989 when the plaintiffs filed supplemental proposed findings of fact and a response to the Secretary's proposed findings of fact (Docket Entry No. 82). This matter is now ripe for decision by the Court.

3. The standards and procedures for receipt of each of these types of benefits are the same. Disability is governed by 42 U.S.C. § 401 *et seq.* and supplemental security income is governed by 42 U.S.C. § 1381 *et seq.*

petitions a state agency, designated by the Secretary, for the benefits. If unsuccessful, the claimant then asks that state agency for reconsideration.

If rebuffed at that level, the claimant requests a hearing before an Administrative Law Judge ("ALJ") who is an employee of the Social Security Administration. If the ALJ renders an adverse decision, the claimant then petitions the Appeals Council of the Social Security Administration for review. If the Appeals Council declines review or upholds the ALJ's decision, the claimant may then seek review by filing a civil action in the district court governing the area of his residence. The claimant then has conventional rights of appeal for adverse court decisions, including possible review by the Supreme Court.

 The courts must affirm the Secretary's findings as to disability if those findings are supported by "substantial evidence," 42 U.S.C. § 405(g). In this context, "substantial evidence" means the quantum of evidence that would defeat a motion for directed verdict if the administrative proceedings had been a civil jury trial. *See Winston v. Heckler*, 585 F.Supp. 362 (D.N.J.1984) (citing and quoting from *Labor Board v. Columbian Enameling and Stamping Co.*, 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939)).

Throughout the administrative phase of the disability determination, the Secretary follows a five-step sequential process.[4] That process was detailed comprehensively in *Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987), and will be described below.

First, the Secretary (through his agent, the ALJ), determines if the claimant is working or "engaged in substantial gainful activity" at the time of the hearing. If so, the claimant is not disabled and the inquiry ends.

If the claimant is not working, the next issue is whether or not his impairment is "severe." "An impairment ... is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). *See also* 20 C.F.R. § 416.921(a). The subsections that follow each of these cited C.F.R. sections list basic work activities such as walking, standing, hearing, speaking, following instructions, using judgment and general social relations.

If the impairment is not severe, the claimant is considered not disabled. If it is severe, the next step is to determine whether the claimant's impairment(s) meets or exceeds a listed impairment.[5] If the listing is met or exceeded, the claimant is conclusively presumed disabled. If the listing is not met, the ALJ determines whether the claimant retains the residual functioning capacity to do his former work. If it is found that the claimant cannot perform his prior work, the burden—after having rested with the claimant in steps one through four—shifts to the Secretary to show that the claimant can do other work available in the national economy. *See Yuckert, id.* This final determination is based on the claimant's age, education and work experience.

The Third Circuit has, in this context, articulated certain standards that the Secretary is to employ when evaluating alcoholism claims. Those standards were first announced in *McShea v. Schweiker*, 700 F.2d 117 (3d Cir.1983) and followed in *Purter v. Heckler*, 771 F.2d 682 (3d Cir.1985).

---

4. Throughout these proceedings, the Secretary has strenuously contended that his adherence to this five-step process that will be described in the text is the same for alcoholism as it is for any other alleged disability. The Secretary is apparently asserting that his fidelity to this process precludes a finding of non-acquiescence; that term will be defined later. The Secretary's argument misperceives the issues at stake here. No one is contending that the Secretary is not following the five-step process. Further, no one contends that the process is *per se* invalid. Instead, the standards the Secretary applies and the conclusions he reaches from the standards, which are used to *implement* the five-step process, are at issue here.

5. A listed impairment is one that is in fact listed, along with its necessarily accompanying symptoms, in the Regulations. The listings at issue here are those in § 12.09 of 20 C.F.R., Part 404, Subpart P, Appendix 1. They will be explored in detail later.

In *McShea,* the Third Circuit surveyed law in other circuits and adopted it. In so doing, the Court said: "[C]hronic alcoholism ... standing alone can, if serious enough, amount to a disability ... The proposition that chronic acute alcoholism is itself a disease, a medically determinable physical or mental impairment, is hardly debatable today." *Id.* at 118 (quoting *Griffis v. Weinberger,* 509 F.2d 837, 838 (9th Cir.1975)). The Third Circuit remanded the plaintiff's case to the Secretary for evaluation under the standard noted above. The court observed: "The ALJ in the case at hand apparently believed that if he found no objective physical impairment resulting from alcoholism, the inquiry was ended. That theory, however, has been rejected by the courts." *McShea,* 700 F.2d at 119 (citing *Hicks v. Califano,* 600 F.2d 1048 (4th Cir. at 1979)). *Accord Cannon v. Harris,* 651 F.2d 513 (7th Cir.1981), *Adams v. Weinberger,* 548 F.2d 239 (8th Cir.1977) *and Ferguson v. Schweiker,* 641 F.2d 243 (5th Cir.1981).

In *Purter v. Heckler,* 771 F.2d 682, 697–98 (3d Cir.1985), the Third Circuit explained its holding in *McShea,* stating

[In *McShea* ], we held that alcoholism, either standing alone or combined with other causes, may constitute a compensable injury. Consistent with this position, we rejected the Secretary's adherence to her belief that alcoholism is a self-inflicted condition. We found ... untenable the Secretary's position that [her] inquiry into the issue of alcoholism ends with medical evidence supporting a finding of "no objective physical impairment." Because a negative attitude toward admission of a tendency to drink heavily "is a common accompaniment of the disease of alcoholism," and because the disease is often masked by other disorders which are more readily diagnosable, we imposed an affirmative duty on the ALJ to inquire further and to develop a full and fair record wherever evidence of alcohol abuse is present in the record ... [T]he relevant inquiry, where there is evidence of alcoholism, is not whether the claimant should be able to control it, but rather whether the claimant is addicted to alcohol and as a consequence, has lost the ability to control its use. (citations and footnotes omitted)

*McShea* and *Purter* form the basis of the plaintiff's suit.[6] They allege that, rather than obeying the mandate of those cases, the Secretary continues his prior policy of requiring so-called end-organ damage before he will find alcoholism to be a disabling condition.

Plaintiffs allege that this is an example of a phenomenon unique to federal agencies known as "nonacquiescence."

"Indeed at oral argument the Justice Department attorney appearing for the [Secretary] conceded that the Social Security Administration pursues, with respect to certain rulings by courts of appeals, a policy of nonacquiescence. The Social Security Administration has, for example, adopted such a policy with respect to an April 16, 1981 decision of the United States Court of Appeals for the Ninth Circuit [*Finnegan v. Matthews,* 641 F.2d 1340 (9th Cir.1981) ] holding that disability benefits could not be terminated unless it showed that there was

---

**6.** As noted earlier, plaintiffs also contend that the Secretary is violating the 1984 Social Security Disability Benefits Reform Act, 42 U.S.C. 421, note. The specific command of that statute which the plaintiffs accuse the Secretary is violating reads as follows:

"(a) The Secretary of Health and Human Services (hereafter in this section referred to as the "Secretary") shall revise the criteria embodied under the category 'Mental Disorders' in the 'Listing of Impairments' in effect on the date of the enactment of this Act [Oct. 9, 1984] under appendix I to subpart P of part 404 of title 20 of the Code of Federal Regulations. The revised criteria and listings, alone and in combination with assessments of the residual functional capacity of the individuals involved, shall be designed to realistically evaluate the ability of a mentally impaired individual to engage in substantial gainful activity in a competitive workplace environment. Regulations establishing such revised criteria and listings shall be published no later than 120 days after the date of the enactment of this Act [Oct. 9, 1984].

The Court will address this in more detail when it analyzes the Regulations at issue. The Court notes now, however, that it would be difficult to intellectually defend a finding of the violation of such a general command.

a material improvement in the claimant's medical condition."

*Kuehner v. Schweiker*, 717 F.2d 813, 816 (3d Cir.1983), *vacated on other grounds*, 469 U.S. 977, 105 S.Ct. 376, 83 L.Ed.2d 312 (1984).

In even stronger language, the *Kuehner* court characterized the Secretary's nonacquiescence policy as follows:

It thus appears that, when the Secretary has taken a final position on a disputed question, he will continue to adhere to, and require compliance with, those views even after a Court of Appeals has resolved the issue against him. Under these circumstances, exhaustion of administrative remedies becomes a mere exercise in futility, both for the claimants and for the courts. *It makes far more sense to allow the claimants to litigate the case and, if successful, to obtain a decree enforceable via contempt proceedings.*

*Kuehner*, 717 F.2d at 824 (Becker, J., concurring) (emphasis added).

In this case, the plaintiffs have taken Judge Becker's advice and they seek to abate alleged nonacquiescence to *McShea* and *Purter*.

Predictably, the Secretary denies nonacquiescence and points to a statement by his Acquiescence Task Force [7] professing obedience of *McShea* and *Purter*. Plaintiffs have directed the Court to several telling events or conditions that suggest otherwise. The first of those that the Court will examine is the underlying Regulations themselves.

*The Regulations*

Earlier the Court noted that a claimant will be conclusively presumed disabled if his impairments meet or exceed the listed impairments. These listings addressing alcoholism are found at § 12.09 of 20 C.F.R., Part 404, Subpart P, Appendix 1. § 12.09 cross-references to several other sections. All of these, including § 12.09, are listed in the margin.[8]

---

**7.** The Acquiescence Task Force (ATF) is a sort of committee created by the Secretary to monitor his compliance with Court of Appeals decision and to recommend acquiescence to particular decisions. The Court accords little, if any, weight to the ATF's assertion here because actions speak louder than words and because the record belies the ATF's assertion.

**8.** 12.09 *Substance Addiction Disorders:* Behavioral changes associated with the regular use of substances that affect the central nervous system.

The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.

 A. Organic mental disorders. Evaluate under 12.02.
 B. Depressive syndrome. Evaluate under 12.04.
 C. Anxiety disorders. Evaluate under 12.06.
 D. Personality disorders. Evaluate under 12.08.
 E. Peripheral neuropathies. Evaluate under 11.14.
 F. Liver damage. Evaluate under 5.05.
 G. Gastritis. Evaluate under 5.04.
 H. Pancreatitis. Evaluate under 5.08.
 I. Seizures. Evaluate under 11.02 or 11.03.
The sections referenced above, in the order that they appear in § 1209 provide:

 12.02 *Organic Mental Disorders:* Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

 A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
 1. Disorientation to time and place; or
 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
 3. Perceptual or thinking disturbances (e.g. hallucinations, delusions); or
 4. Change in personality; or
 5. Disturbance in mood; or
 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;
 AND
 B. Resulting in at least two of the following:
 1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

12.06 *Anxiety Related Disorders:* In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors); OR

C. Resulting in complete inability to function independently outside the area of one's home.

12.08 *Personality Disorders:* A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1. Seclusiveness or autistic thinking; or

2. Pathologically inappropriate suspiciousness or hostility; or

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect; or

5. Pathological dependence, passivity, or aggressivity; or

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior; AND

B. Resulting in three of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

11.14 *Peripheral neuropathies.*

With disorganization of motor function as described in 11.04B, in spite of prescribed treatment.

11.04 *Central Nervous System Vascular Accident.* With one of the following more than 3 months post-vascular accident:

. . . .

B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. . . .

5.05 *Chronic liver disease (e.g., portal, postnecrotic, or biliary cirrhosis; chronic active hepatitis; Wilson's disease).* With:

A. Esophageal varices (demonstrated by X-ray or endoscopy) with a documented history of massive hemorrhage attributable to these varices. Consider under a disability for 3 years following the last massive hemorrhage; thereafter evaluate the residual impairment; or

B. Performance of a shunt operation for esophageal varices. Consider under a disability for 3 years following surgery; thereafter, evaluate the residual impairment; or

C. Serum bilirubin of 2.5 mg. per deciliter (100 ml.) or greater persisting on repeated examinations for at least 5 months; or

D. Ascites, not attributable to other causes, recurrent or persisting for at least 5 months, demonstrated by abdominal paracentesis or associated with persistent hypoalbuminemia of 3.0 gm. per deciliter (100 ml.) or less; or

E. Hepatic encephalopathy. Evaluate under the criteria in listing 12.02; or

F. Confirmation of chronic liver disease by liver biopsy (obtained independent of Social Security disability evaluation) and one of the following:

1. Ascites not attributable to other causes, recurrent or persistent for at least 3 months, demonstrated by abdominal paracentesis or associated with persistent hypoalbuminemia of 3.0 gm. per deciliter (100 ml.) or less; or

2. Serum bilirubin of 2.5 mg. per deciliter (100 ml) or greater on repeated examinations for at least 3 months; or

3. Hepatic cell necrosis or inflammation, persisting for at least 3 months, documented by repeated abnormalities of prothrombin time and enzymes indicative of hepatic dysfunction.

5.04 *Peptic ulcer disease (demonstrated by X-ray or endoscopy).* With:

A. Recurrent ulceration after definitive surgery persistent despite therapy; or

B. Inoperable fistula formation; or

C. Recurrent obstruction demonstrated by X-ray or endoscopy, or

D. Weight loss as described under § 508.

5.08 *Weight loss due to any persisting gastrointestinal disorder:* (The following weights are to be demonstrated to have persisted for at least 3 months despite prescribed therapy and expected to persist at this level for at least 12 months.) With:

A. Weight equal to or less than the values specified in Table I or II; or

B. Weight equal to or less than the values specified in Table III or IV and one of the following abnormal findings on repeated examinations:

1. Serum albumin of 3.0 gm. per deciliter (100 ml.) or less; or

2. Hematocrit of 30 percent or less; or

3. Serum calcium of 8.0 mg. per deciliter (100 ml.) (4.0 mEg./L) or less; or

4. Uncontrolled diabetes mellitus due to pancreatic dysfunction with repeated hyperglycemia, hypoglycemia, or ketosis; or

5. Fat in stool of 7 gm. or greater per 24–hour stool specimen; or

6. Nitrogen in stool of 3 gm. or greater per 24–hour specimen; or

7. Persistent or recurrent ascites or edema not attributable to other causes.

Tables of weight reflecting malnutrition scaled to height and sex—To be used only in connection with 5.08.

The tables to which § 5.08 refers are not reproduced here. But, since those tables reflect weight necessary to find malnutrition, those tables list extremely low weight in comparison to height.

11.02 *Epilepsy—major motor seizures, (grand mal or psychomotor), documented by EEG and by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment.* With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

§ 11.03 *Epilepsy—Minor motor seizures (petit mal, psychomotor, or focal), documented by EEG and by detailed description of a typical secure pattern, including all associated phenom-*

The Court will comment on these Regulations only briefly in the text, inasmuch as they speak for themselves in the margin. These Regulations are plainly inconsistent with the rule of *McShea* and *Purter*. Any differences between the Regulations for purposes of a *McShea–Purter* analysis are differences only of degree. Section 12 arguably contradicts *McShea* and *Purter* in that its listings require certain psychological manifestations before a substance abuse disorder can be conclusively found to be disabling; *McShea* and *Purter* invalidated the requirement of *physical* symptoms accompanying a substance abuse disorder. Nonetheless, Section 12 frustrates the purpose of *McShea* and *Purter*. It is possible, although perhaps unlikely, that an alcoholic could be disabled within the meaning of *McShea* and *Purter*, yet still not exhibit the discrete set of symptoms any of the individual parts of Section 12 require.

But, sections 5 and 11 are direct, and rather egregious, violations of *McShea* and *Purter*. Those two sections expressly require the onset of physical symptoms that *McShea* and *Purter* just as expressly remove from the disability analysis.

The effect of sections 5, 11 and 12 is that a claimant would *never* be conclusively presumed disabled under the *McShea–Purter* rule. This is in direct contravention of these two decisions, and renders them in large measure ineffective. Although this in itself is a blatant disregard of an appellate court's binding pronouncements, the present posture of sections 5, 11 and 12 would not be alarming if it operated only in isolation. These Regulations affect only the third step of a sequential five-step disability determination.

But, the Regulations do not operate in isolation. The record shows other compelling evidence of a pattern of "nonacquiescence" to *McShea* and *Purter*. Some of that evidence is found in post-*McShea* decisions by district courts in the Third Circuit.

*Post–McShea Decisions in the Third Circuit*

The plaintiffs have directed the Court to decisions by district courts in the Third Circuit, spanning from 1983 through 1989, wherein the Secretary was reversed or remanded. Although the degree of error varied among the cases, the type of error was always the same: the failure of the Secretary and his agents to obey *McShea* and *Purter*. These cases are listed in the margin.[9]

ena; *occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment*. With alteration of awareness or loss of consciousness and transient postictal manifestations or unconventional behavior or significant interference with activity during the day.

9. *Andrews v. Heckler*, 573 F.Supp. 1089, 1093 (E.D.Pa.1983); *Freund v. Heckler*, No. 83–2309 Slip op. (E.D.Pa. November 30, 1984) (LEXIS, Genfed library, Dist file); *Ward v. Heckler*, No. 83–6257 Slip op. (E.D.Pa. March 18, 1985) (LEXIS, Genfed library, Dist file); *Murphy v. Heckler*, 613 F.Supp. 1233 (W.D.Pa.1985); *Nangle v. Heckler*, 598 F.Supp. 341 (E.D.Pa.1984); *Veal v. Heckler*, 610 F.Supp. 1094 (E.D.Pa.1985); *McShea v. Schweiker*, No. 81–2832 Slip op., available WESTLAW DCTU database (E.D.Pa. Dec. 5, 1985) (LEXIS, Genfed library, Dist file); *Allen v. Schweiker*, 666 F.Supp. 720 (E.D.Pa. 1986); *Lymore v. Heckler*, No. 84–2442 Slip op., 1986 WL 9892 (E.D.Pa. Sep. 8, 1986) (LEXIS, Genfed library, Dist file); *Postell v. Bowen*, No. 85–0345 Slip op., 1986 WL 11826 (E.D.Pa. Oct. 22, 1986) (LEXIS, Genfed library, Dist file); *Martinez v. Bowen*, No. 86–4856, Slip op., 1988 WL 33911 (E.D.Pa. March 30, 1988) (LEXIS, Genfed library, Dist file); *Nero v. Bowen*, No. 85–3281 Slip op., 1988 WL 68916 (D.N.J. June 29, 1988) (LEXIS, genfed library, Dist file); *Saunders v. Bowen*, No. 83–3706 Slip op., 1988 WL 107598 (E.D.Pa. Oct. 14, 1988) (LEXIS, Genfed library, Dist file); *Schultz v. Bowen*, No. 87–2185 Slip op., 1988 WL 124627 (E.D.Pa. Nov. 17, 1988) (LEXIS, Genfed library, Dist file); *Burton v. Bowen*, 704 F.Supp. 599 (E.D.Pa. Jan. 30, 1989); *Hamer v. Bowen*, No. 87–3867 Slip op., 1989 WL 14079 (E.D.Pa. Feb. 21, 1989) (LEXIS, Genfed library, Dist file); *Schneck v. Bowen*, No. 88–0901 Slip op., 1989 WL 109557 (M.D.Pa. Feb. 27, 1989) (LEXIS, Genfed library, Dist file). *Hamer*, *Burton*, *Schultz* and *Martinez* implicated *McShea* and *Purter* only marginally if at all. *Schneck*, *Murphy*, *Veal* and *Freund* remand to the Secretary for him and his agents to develop a full and fair record on the impact of the claimant's alcoholism, or related syndrome; the Secretary's prior failure to do so violated *McShea* and *Purter*. *Andrews*, *Nangle*, *Lymore* and *Postell* all remand to the Secretary. With the possible exception of *Postell*, all of these cases directly chastise the Secretary for requiring "end organ damage," in the context of an alcohol disability claim, in violation of *McShea* and *Purter*. *See also Jimenez v. Heckler*, No. 84–0992 (E.D.Pa. Dec. 21, 1984). End organ

This Court can add a case of its own to that list. On June 5, 1989, this Court reversed a determination by the Secretary that held an alcoholic claimant to not be disabled. *Glenn v. Bowen,* No. 88–3911, 1989 WL 60451 (E.D.Pa. June 5, 1989) (Hannum, S.J.) (available on LEXIS, genfed library, 3 dist file). One of the grounds for this Court's decision in *Glenn* was the ALJ's holding that Mr. Glenn was not disabled from his alcoholism because he showed no end organ damage. It need not be repeated that such a finding by an ALJ is directly antithetical to the rule of *McShea* and *Purter.*

The ALJ's ruling in *Glenn* was yet another example in a long line of them showing the Secretary's adamant refusal to follow *McShea* and *Purter.* The incidents noted above and in the margin are too numerous and occur over too sustained a period of time for this Court to believe that their recurrence is mere coincidence. This line of cases instead shows a clear intent and direct choice by the Secretary to ignore *McShea* and *Purter,* two cases that he, like anyone else who is directly affected by a judicial mandate, is supposed to obey.

The Court's conclusion is bolstered by record evidence of admissions by the Secretary's personnel. This evidence will be detailed below.

*Admissions on Non–Acquiescence*

A case very similar to this one is *Morrison v. Heckler,* 582 F.Supp. 321 (W.D. Wash.1983). In that case, the court issued an injunction against the Secretary to remedy his failure to follow the *Griffis* case, the Ninth Circuit analog to *McShea* and *Purter.* Perhaps indicative of the Secretary's attitude toward "acquiescence," is the fact that contempt proceedings are ongoing in *Morrison.*

On October 4, 1988, in connection with the *Morrison* contempt proceedings, the depositions of Welenda Elliott Williman and Albert L. Harrison were taken at the Social Security Administration office in Baltimore, Maryland.

Ms. Williman is a social security insurance specialist for Social Security. She prepares agency policy on legislation. She also answers inquiries on Social Security policy. Those inquiries most frequently come from Social Security's regional offices or from members of Congress. Her responses to some questions on Social Security's policy toward evaluation of alcoholism are quite revealing.

A portion of her deposition follows. Unless otherwise noted, the questions are propounded by Donna Fuchsluger, Esq., counsel for the Secretary in *Morrison.*

A SSA's policy is that a diagnosis of uncontrollable addiction to alcohol or drugs alone cannot be the sole basis for allowing or denying a claim. That uncontrollable addiction to alcohol or drugs is considered in assessing the individual's residual functional capacity. However,

---

damage, incidentally, has been defined as damage to the heart, brain, kidneys or eyes. *See Martin v. Secretary of HEW,* 492 F.2d 905 (4th Cir.1974). Finally, *Saunders, Nero, Allen, McShea* (on remand) and *Ward* are all decisions in which the prevailing social security claimant is awarded counsel fees by the court. These cases are particularly significant because in each instance the fees were awarded under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. The EAJA permits an award of counsel fees only if the Government's position in litigation is not substantially justified. It follows then that in each of these cases, the court found that the Government's position was in fact not substantially justified. The reason for that finding in each case was the Secretary's brazen disregard of *McShea* and *Purter.*

The plaintiffs, in their exhibits of record, have also shown several instances where an ALJ or the Appeals Council have denied benefits by failing to apply *McShea* and *Purter.* The only difference between these occurrences and the cases cited above is that these claimants' cases have not or for whatever reason will not reach the courts.

With the detail accorded the plaintiffs' exhibits, the Court does not mean to imply that the Secretary's exhibits were not examined. The Court did thoroughly examine the Secretary's exhibits and will offer some observations.

The Secretary's exhibits consist mostly of intra-agency memoranda wherein agency personnel purport to apply the proper standard for evaluation of alcoholics' disability claims. Most of these memoranda are cast in aspirational terms. To the extent that they are not aspirational, the Court does not find them credible. As was noted earlier, actions speak louder than words, and the Secretary shows a persistent policy of undercutting or ignoring *McShea* and *Purter.*

uncontrollable addiction by itself does not equate with a deficit in functioning that is so severe as to preclude [substantial gainful activity]. So, I would rewrite this, to indicate that.

Q. My question to you is a little different, and I apologize if it wasn't clear. It wasn't what changes if any you would make in that paragraph. My question to you, which I'll ask again, is in your opinion, is the second paragraph of the answer, which begins "Rather, the uncontrollable," an accurate statement of Social Security policy?

A. I think the answer is that this second paragraph of this answer is not an accurate description of policy, because it does not indicate that once a medically determinable impairment associated with uncontrollable addiction to alcohol or drugs has been established, then you proceed to determine disability. It's not the uncontrollable addiction that is disabling, it's the medically determinable impairment associated with uncontrollable addiction, that produces significant functional limitations, which prevent work, that is disabling. I think this paragraph is not correct, because it does not clearly indicate that.

Q Could you simply read that for the record?

A The paragraph says, "If the evidence"—the sentence says, "If the evidence establishes that a person is addicted to drugs or alcohol, cannot control the use of either or both of these substances, and that such addition precludes obtaining or maintaining employment, these findings standing alone are sufficient to establish disability."

Q Does the sentence you've just read accurately reflect Social Security policy?

A. I think it does not, in that it does not say "If the evidence establishes a medically determinable impairment, associated with the addiction to drugs or alcohol, or associated with the inability to control use of either or both of these substances, and that the uncontrollable drinking or the addiction to drugs or alcohol produces significant functional limitations, which preclude performance of [substan-

tial gainful activity], then a finding of disability may be made."

Q Can a person with a substance addiction disorder be found disabled if the medical evidence of record does not document the presence of any medical signs, symptoms and findings, involving multiple body systems, associated with the person's addiction?

A To be found disabled, you must have medical signs and findings, which establish the presence of a medically determinable impairment.

Q Would you look at Exhibit 4, the second paragraph, and the second sentence? You may read it out loud.

A "While the claimant's inability to control the use of addictive substances must be considered in assessing RFC, a finding of uncontrollable drinking or drug use alone does not establish a level of functional deficit that prevents the performance of [substantial gainful activity]."

Q Does this statement state Social Security Administration policy?

A Yes, it does.

Q [by William Rutzig, Esq., counsel for plaintiff in *Morrison*] Is the policy any different in states such as Washington, and in states such as Florida or Pennsylvania?

A To my knowledge, the policy is not different from one state to another.

The deposition of Albert R. Harrison provides insight in a similar vein. Mr. Harrison is the Deputy Director for the Division of Medical and Vocational Policy of the Office of Disability, an arm of the Social Security Administration. Portions of Mr. Harrison's deposition follow:

A In evaluating alcoholism, we recognize that uncontrollability is a factor. However, we do not feel that cases turn on whether or not the addiction is uncontrollable.

Q Do you believe that the secretary, in evaluating an alcoholism case, must make a specific findings of the claimant's ability to control his or her use of alcohol?

A No.

Q What is misleading about referencing addiction as being so uncontrollable so as to impair the individual's gainful activity?

A A couple of problems. Number one, it sort of gets away from the main premise that's set out in the program circular, and that is the need for a medically determinable impairment, that can be based on signs, symptoms and findings. That's a requirement of the law. I think—I'm not actually sure—that's even so stated in Griffis, although it's not—it's certainly not—if it's not so stated in Griffis, it's consistent with Griffis. That's the first part.

The second part that is troublesome is the issue of a case turning on whether alcohol limits is controllable or uncontrollable. I don't think the case should turn on whether it's controllable or uncontrollable.

Q You've indicated that. My question to you, sir, is how is it misleading, [is a Program Operations Manual System the witness was reading][10] with regard to the issue of the need for a medically determinable impairment, if at all.

A Because a possible reading of this is all that is needed is an uncontrollable addiction, and to me an uncontrollable addiction does not establish a medically determinable impairment.

Q. Just for the record, if I can complete the question—the answer contained in Exhibit Number 4?

A The next sentence. "The adjudicator must adequately inquire whether the claimant is addicted to alcohol and drugs."

Q Does that say alcohol or drugs?

A. "Addicted to alcohol or· drugs. And as a consequence, has lost the ability to control the use of either of these substances, and whether their use precluding the obtaining and maintaining employment."

Again, this ability to control, this suggests that the case will turn on the ability to control, which we would pose the case should not turn on the ability to control....

These two sworn depositions quite unambiguously reflect two policy-making officials, agents of the Secretary, repudiating the rule of *McShea* and *Purter*. When combined with the Regulations as analyzed and reproduced previously, and the line of claimants' cases—both in and out of court—where ALJ's consistently refused or failed to apply *Purter* and *McShea* rules, only one conclusion becomes positively inescapable.

That conclusion is that the Secretary and his agents have systematically, continuously, willfully and almost scornfully ignored the mandates of *McShea* and *Purter* literally from the days those two cases were decided. In a constitutional system such as ours where all are supposed to be governed by the rule of law, this Court cannot and will not tolerate such a course of conduct. For the reasons stated and implied above, and additionally for those stated below, the Secretary will be permanently enjoined from violating *McShea* and *Purter*, with the appropriate relief as stated in the attached Order.[11]

10. A Program Operations Manual System (POMS) is apparently a policy guideline or mandate, sent to regional Social Security offices periodically, that articulates the agency's requirements for implementation of its policy.

11. The injunction the Court will issue will be a permanent rather than preliminary injunction for several reasons. First, the Court needs no more evidence of the Secretary's non-acquiescence; evidence of that already abounds. Therefore, further proceedings would be a waste of both judicial and private resources in a case that has already lingered for over five years. If the June 16, 1989 hearing in this case is construed as a hearing on a preliminary injunction, that fact alone would not preclude the grant of a permanent injunction.

> It is settled beyond controversy that if, at the hearing on an application for preliminary injunction, the evidence shows clearly that the plaintiff has not stated a claim upon which relief can be granted and cannot state such a claim, the Court should dismiss the plaintiff's complaint. (citation omitted). That long established practice is akin to the more modern practice of granting summary judgment ... When the circumstances warrant, it would seem that a similar prompt procedure should

*Conclusions of Law*

The decision as to whether or not to issue permanent injunctive relief, and how to shape that relief, is left to the sound discretion of the trial Court. *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). The standards governing the issuance of a permanent injunction have been stated recently in this Court.

> The threshold hurdle for a permanent injunction requires that the plaintiff establish that its request would constitute a proper exercise of the [C]ourt's equitable jurisdiction. Equity jurisdiction is proper if: (1) the plaintiff has no adequate legal remedy, (2) the threshold injury is real, not imagined, and (3) no equitable defenses [*e.g.,* unclean hands, laches] preclude jurisdiction. (citation omitted)

*Northeast Women's Center, Inc. v. McMonagle,* 665 F.Supp. 1147, 1153 (E.D.Pa. 1987), *modified on other grounds,* 868 F.2d 1342 (3d Cir.1989). *See also O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

■ Additionally, and perhaps paradoxically, a party need not show irreparable harm to obtain permanent injunctive relief. But, the presence or imminent threat of irreparable harm is a very strong indication of the inadequacy of a legal remedy. *McMonagle,* 665 F.Supp. at 1153 n. 3. The inability to measure an injury in monetary terms is also a strong suggestion of the inadequacy of a legal remedy. *Cf. Miller v. American Telephone &*

*Telegraph Corp.,* 344 F.Supp. 344 (E.D.Pa. 1972) (calculable damages means any impending harm is not irreparable). Furthermore, a legal remedy is normally considered inadequate if it would result in a multiplicity of lawsuits or if the action sought to be remedied is likely to recur often. *See McMonagle,* 665 F.Supp. at 1153. *See also Bangor Baptist Church v. Maine Education Dept.,* 576 F.Supp. 1299, 1324 (D.Me.1983). The Court must also consider the hardship to the parties if a permanent injunction is entered, and the Court must, perhaps above all in a case like this one, consider the public interest. *See Hall v. Austin,* 495 F.Supp. 782, 719 (E.D. Mich.1980).

■ The Court believes that all of the above factors weigh in favor of issuing a permanent injunction in this case. The plaintiffs' injury, in terms of impact on the plaintiffs' class, is real and ongoing; furthermore, the Secretary certainly offers no sign of change in his injurious policies. The Secretary raises no equitable defenses against a permanent injunction. Certainly, the plaintiffs have no adequate legal remedy. It is impossible to state in dollars the harm to the class if the Secretary's unfair and illegal policies continue. There will no doubt be countless individual court actions in the future if these policies continue; the harm will occur again and again.

In addition, the Court believes that those claimants who have been denied benefits in the past have already suffered irreparable harm because of the Secretary's refusal to heed *McShea* and *Purter.* Even with the

---

be available against the defendant as is provided against the plaintiff.
*Standard Oil Co. of Texas v. Lopeno Gas Co.,* 240 F.2d 504, 510 (5th Cir.1957).
If the outstanding motions or responses are to be considered motions for summary judgment, a permanent injunction similarly would not be improper. *American Airlines, Inc. v. Transport Workers Union of America,* 45 F.R.D. 1, 2–3 (N.D.Okla.1968). But, the Court should—and has—employed caution with this course of action. *Woods v. Wallace,* 8 F.R.D. 140, 142 (E.D. Pa.1948).
Further it is fair to say that, if the Court's action is construed to be its decision on a motion or cross-motions for summary judgment, the parties are prepared for such a disposition.

The Secretary has expressly moved for summary judgment (Docket Entry No. 73). Moreover, the one party who could be prejudiced by the Court's ruling—the Secretary—has characterized the plaintiff's motion as a motion for summary judgment. *See* Transcript of June 16, 1989 Hearing (Docket Entry No. 77) at 40. *See also* Defendant's Memorandum in Opposition to Plaintiff's Motion for Injunctive Relief, and in Support of Defendant's Motion for Summary Judgment (Docket Entry No. 73) at 42–43. Both in his brief and at argument, the Secretary's counsel stated that the plaintiffs could obtain the relief they seek only through a final—and not preliminary—adjudication of this case.

relief the Court grants today, those claimants have lost months and perhaps years of benefits they unquestionably deserved since the day of the *McShea* decision. With that loss of benefits, those claimants also lost an acceptable standard of living and lost the security—however intangible—that comes from an ordered society's (and a federal agency's) adherence to the rule of law. These are months and years that this class of claimants will never get back; that alone makes the harm inflicted by the Secretary irreparable.

The balance of harms also favors the plaintiffs. The issuance of a permanent injunction does not create harm for the plaintiffs; conversely it finally eradicates an ongoing harm. The only "harm" visited upon the Secretary by the issuance of this injunction is a forced compliance with existing, unambiguous law. If that is harm, let there be more of it.

Finally, the public interest is best served by the issuance of a permanent injunction. From today forward, the public can rest assured that the law will be applied as it has been written by the Third Circuit. Members of the public can also be secure in knowing that, should the dreaded disease of alcoholism wrench any of them to the point that they cannot work, they will have a fair chance to obtain through social security disability payments the basis subsistence that they need and deserve.

■ This discussion has centered on *McShea* and *Purter*. The plaintiffs also seek a finding that the Secretary has violated the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 421, note.[12] The Court does not believe that such a violation has occurred.

The provision of the Disability Reform Act at issue here is general, so general that it would be almost impossible to violate it. The Court could find a violation only if the

Secretary's response to the mandate of the Act were arbitrary and capricious. *Bowen v. Yuckert*, 482 U.S. 137, 145, 107 S.Ct. 2287, 2293, 96 L.Ed.2d 119 (1987). Although the Regulations promulgated by the Secretary pursuant to the Act are highly inappropriate, inconsistent with *McShea* and *Purter* and adopted against the recommendation of the Secretary's own Work Group,[13] the Court does not believe they are "arbitrary and capricious" as that phrase is used in *Yuckert*.

Nonetheless, § 12.09 is patently inconsistent with *McShea* and *Purter*, and it will be invalidated for that reason. The Court will designate substitute regulations whose duration will be sixty (60) days, after which the Secretary will publish regulations consistent with *McShea* and *Purter*.[14]

The action the Court takes today is directly supported by precedent. *Morrison v. Hecker*, 582 F.Supp. 321 (W.D.Wash. 1983). Unfortunately, that does not make the Court's decision or its enforcement obligation any easier.

This is a decision the Court made only after careful reflection and a thorough review of the parties' arguments and exhibits. It is not easy to publicly state that a party is not following the law. Yet if the Court failed to do that here, it would not be fulfilling its duty as a Court under the supervision of the Third Circuit. This Court must not only follow the Third Circuit's precedents, it must also take whatever steps are necessary to vindicate and insure the implementation of those precedents. *Cf. Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863 (3d Cir.1984) (castigating trial court for "adopting" the rationale of a Third Circuit dissenting opinion).

Even apart from the duty owed to the Third Circuit, this Court owes a duty to the members of the public who have been

**12.** *See supra,* note 6.

**13.** *See* Plaintiffs' Supplemental Memorandum of Law in Support of Motion for Preliminary and Permanent Injunction (Docket Entry No. 68) at 55–57. The Secretary has not controverted the plaintiffs' assertions about his decline of the Work Group's recommendations.

**14.** The temporary substitute for § 12.09 of the Regulations will be that definition listed in the Diagnostic and Statistical Manual of Mental Disorders (DSM–III) from the American Psychiatric Association. *See* Plaintiffs' Exhibits (Docket Entry No. 78) at 322–32.

wronged by the Secretary's disregard of *McShea* and *Purter*. "Nonacquiescence" is too kind a term for the Secretary's actions. His willful infidelity to judicial mandate is a kind of pernicious, almost frightening lawlessness that must be stopped dead in its tracks. Like the civil rights violations and disregard of court rulings in the 1950's and 1960's, the Secretary's conduct impacts on the most vulnerable members of our society, those who lack the resources and training to provide basic subsistence for themselves, let alone fight against the Secretary's institutionalized callousness. The maxim that it is the duty of the courts—and only the courts—to say what the law is, *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 2 L.Ed. 60 (1803) is with this ruling reaffirmed. As of today, the Secretary's flouting of appellate court rulings is a thing of the past.

An appropriate Order follows.

### ORDER

AND NOW, this 25th day of August, 1989, upon consideration of plaintiffs' Renewed Motion for a Preliminary and Permanent Injunction (Docket Entry No. 68), the defendant's Motion for Summary Judgment and Supporting Exhibits (Docket Entry No. 73), plaintiffs' Memorandum in Response to Defendant's Motion for Summary Judgment (Docket Entry No. 74), the Transcript of this Court's June 16, 1989 hearing on this matter (Docket Entry No. 77), plaintiffs' Exhibits in Support of Their Renewed Motion for Preliminary and Permanent Injunction (Docket Entry No. 78), plaintiffs' Proposed Findings of Fact (Docket Entry No. 79), defendants' Proposed Findings of Fact and Conclusions of Law (Docket Entry No. 80) and plaintiffs' Supplement to Proposed Findings of Fact and Reply to Defendant's Proposed Findings of Fact (Docket Entry No. 82), plus all supporting briefs or memoranda filed with the above papers and in accordance with the foregoing Memorandum, it is hereby ORDERED that:

1. Defendant's regulations set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1, Section 12.09 and policies and practices thereunder, are void as being violative of the rule of law in *McShea v. Schweiker*, 700 F.2d 117 (3d Cir.1983) and *Purter v. Heckler*, 771 F.2d 682 (3d Cir.1985). For the first sixty (60) days following the date of this Order, the Secretary shall apply the criteria for Substance Addiction Dependence of the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM–III–R) (3d ed., 1987). Sixty (60) days from the date of this Order, the Secretary may either retain the DSM–III–R or adopt another Regulation, at his option, so long as his adopted Regulation is considered with *McShea* and *Purter*. The Secretary must implement this regulation sixty (60) days hence as he normally would, first publishing it as a proposal in the Federal Register. The DSM–III–R remains in effect until the new Regulation is fully and finally implemented. The final Regulation shall become effective, in any event, no later than one hundred twenty (120) days from the date of this Order, and at that time shall be published in the Federal Register.

2. The Secretary of Health and Human Services and all his agents and employees are permanently enjoined from denying or terminating disability benefits to all individuals in the class as defined in the District Court Order who are suffering from alcoholism without application of the rule of law in *McShea v. Schweiker*, 700 F.2d 117 (3d Cir.1983) and *Purter v. Heckler*, 771 F.2d 682 (3d Cir.1985).

3. The Secretary shall reprocess the claims of all class members in the following manner:

a. Within sixty (60) days from this Court's Order, the Secretary will complete the identification process of all individual claimants in Pennsylvania, New Jersey, Delaware and the Virgin Islands who have been denied upon application or termination from SSI or SSDI disability benefits on or after February 18, 1983 (the date of the *McShea* decision).

b. Within sixty (60) days from this Court's Order, the Secretary will locate the claim files of identified class members and begin reconstructing the files of all claim-

ants identified pursuant to paragraph (a) whose claim files are not received by the appropriate office within one month after the obligations of paragraph (a) are complete;

c. Within sixty (60) days from this Court's Order, the plaintiffs will develop appropriate notices for distribution by the Secretary to class members to be distributed immediately upon receipt by the Secretary. Such notices, to be mailed certified mail by the Secretary, will:

(1) inform identified class members that the prior determination of their claim for SSDI and SSI benefits was incorrectly evaluated and is being reviewed under the correct standard, including notice of the need for additional evidence where appropriate; or

(2) for cases pending at the Appeals Council or in federal court, inform the class member of his/her right to elect a remand for a new determination based on the proper standard as enunciated in *McShea* and *Purter.*

d. Within seven (7) days of making a determination of class membership, the Secretary will send the file to the last adjudicator if it is a previously inactive case and send notice of this action to the class member and his/her representative. If the class member's claim is presently pending at any stage of the administrative appeal process, the Secretary will continue to process the claim at that stage, unless a class member elects a remand from the Appeals Council, and will apply the proper standard of evaluation to the SSI and SSDI claims and will notify the class member or his/her representative;

e. The secretary shall reopen the claims of all class members whose applications were denied or benefits terminated by the Secretary, based on the improper evaluation standard, at the last stage of the administrative process pursued, and redetermine these applications based on the proper standard;

(1) With respect to class members whose applications for SSDI and SSI disability benefits have been denied at the initial administrative stage or on reconsideration and who have not requested review by an administrative law judge, the Secretary shall request the necessary information for a redetermination within seven (7) days of receipt of the file at the State Disability Determination Bureau (DDB) or a determination that a pending claim is that of a class member;

(2) Then the Secretary shall make all good faith efforts to complete the evaluation of disability based on the new evaluation standard within four (4) weeks of the date a class member's case file and completed evidentiary development are received by DDB;

(3) In conducting the redetermination of those applications at the hearing stage, the Secretary shall make all good faith efforts to schedule and hold such hearings within sixty (60) days of the date of notice of class membership unless a determination of entitlement can be made on the basis of the record;

(4) In conducting the redetermination of those applications pending at the Appeals Council, the Secretary shall notify the class member and his/her representative that they may elect to have the claim remanded for a new hearing before an administrative law judge. The Secretary shall make all good faith efforts to schedule and hold such hearings within sixty (60) days of the class member's election for the remand, unless a determination of entitlement can be made on the basis of the record;

(5) With respect to those class members who have actions pending in federal court, the Secretary will notify them of their rights under this Order and afford them the opportunity to elect a remand for a redetermination or to have their case remain in the federal court. For those class members who elect a remand, the Secretary shall make all good faith efforts to schedule and conduct a hearing before an administrative law judge within sixty (60) days of receipt by the Secretary of notice that the claim has been remanded, unless a determination of entitlement can be made on the basis of the record;

(6) The Secretary will prioritize the re-opening of class members' applications so that class members not presently in payment status will have their files reviewed first;

(7) All class members shall have the rights of administrative and judicial review afforded by 20 C.F.R. Part 416, Subpart N, and 42 U.S.C. § 1383(c).

f. In the event that a notice sent to a class member is returned by the post office undelivered or lost, the Secretary shall send another notice by regular first class mail to the last known address with the words, "Please Forward" clearly printed on the envelope. If again undelivered, the Secretary shall take advantage of all available resources to ascertain the individual's current address or whereabouts for purposes of sending another notice. The Secretary shall utilize the records of each state department of public welfare or public assistance in his efforts to locate individuals who are not located via mail service. If the state welfare agency or other source provides a new or last known address different from the one used by the Secretary, the Secretary shall repeat the first mailing and (if necessary) the second mailing described above. When the Secretary identifies additional class members, he shall extend to them all the rights under this Order for class members.

g. The Secretary shall issue instructions to all the Social Security District Offices, to all staff of the Office of Hearings and Appeals, to all Administrative Law Judges, to the Appeals Council, to all its Regional Offices and to all state Disability Determination Bureaus or agencies requiring compliance with this injunction.

h. In addition to providing individual notice to class members, the Secretary is further ordered to publicize this decision by means of posters in all Social Security district offices, Offices of Hearings and Appeals, and the state welfare and public assistance agency offices in Pennsylvania, New Jersey, Delaware and the Virgin Islands. In addition, posters shall be provided to drug and substance abuse treatment agencies, community health programs, medical and health agencies, hospitals, and non-profit organizations servicing alcoholics and other persons suffering from substance addiction disorders. Plaintiffs' counsel shall approve the content of all public service announcements, posters and press releases before dissemination;

i. The Secretary shall within fifteen (15) days of the date of this Order, issue provisional instructions for compliance with said Order, including procedures to be used in identifying class members, responding to inquiries from asserted class members and their representatives, for re-evaluating initial claims of plaintiff class members who have been denied or terminated at the initial administrative stage or on reconsideration. Such provisional instructions shall be disseminated in typewritten form by telecopier, and provided to plaintiffs' counsel for the prior approval before dissemination. Final instructions shall be issued within thirty (30) days of the date of this Court Order, and similarly provided to plaintiffs' counsel prior to dissemination for their approval.

4. The Secretary shall provide the following monitoring information to plaintiffs' counsel:

a. The Secretary shall immediately provide plaintiffs' counsel with copies of all memoranda, notices, instructions, directives and like documents issued to effect compliance with this Court's Order as those documents are issued;

b. The Secretary shall provide plaintiffs' counsel and the Court with the following reports within the specified time frame referenced from the date of this Court's Order unless otherwise stated:

(1) An alphabetized list of the names, Social Security numbers and total number of class members who have been identified, within one hundred and twenty (120) days and supplemented every ninety (90) days thereafter, with:

(i) the current administrative stage of each class member's claim and the total number of class claims for each of the administrative stages where class members' claims are pending in-

cluding, but not limited to, quality assurance; pending and completed hearings; and files that have not been located;

(ii) the result of the redetermination at each administrative stage for each class member, including the separate total for resulting allowances and denials.

(2) An alphabetized list of the names and Social Security numbers of persons who cannot be notified because their notices were returned by the post office, including a detailed report of all resources employed to locate the class member, within six (6) months of the date of this Order and supplemented every ninety (90) days until defendant's efforts to notify class members pursuant to ¶ 3(f) have ceased.

c. Plaintiffs' counsel shall on five (5) days notice have the right to obtain in Philadelphia, Pennsylvania an adequate and representative sampling of case files and determinations at any stage of the adjudicatory process, including quality assurance and review decisions with the federal and state agencies, to monitor compliance with this decree.

5. If the Secretary decides that an individual is not a class members, then (a) within ten (10) working days thereafter, the Secretary shall make available the person's file to plaintiffs' counsel or a designee thereof; it is understood that plaintiffs' counsel may request that different files be shipped for review to different locations, according to the claimant's present address; (b) the Secretary and plaintiffs' counsel or the designee thereof shall confer if review of the file generates a disagreement with the Secretary's decision as to class membership; and (c) the parties will submit the dispute to this Court for resolution if they cannot resolve it themselves. The Secretary shall keep in mind the standards governing class membership set forth herein as well as this Court's overall remedial intentions and directive that, in cases of doubt, applicants shall be found to be class members.

6. This Court will retain jurisdiction in this case for the purpose of ensuring full and prompt compliance with the terms of this Order.