**Dolores WALLACE, Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES.**

No. 83–5238.

United States Court of Appeals, Third Circuit.

Argued Nov. 14, 1983.
Decided Dec. 19, 1983.

---

Frank A. Cristaudo (argued), West Deptford, N.J., for appellant.

W. Hunt Dumont, U.S. Atty., Paul Blaine (argued), Asst. U.S. Atty., Trenton, N.J., for appellee; Mary Gibbons Whipple, Jerome B. Simandle, Asst. U.S. Attys., Trenton, N.J., on brief.

Before ADAMS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM.

This is an action pursuant to 42 U.S.C. § 405(g) to review a denial of disability benefits under Title II of the Social Security Act, 42 U.S.C. § 416(i), 423 (1976). By letter opinion, the district court granted summary judgment affirming the determination of the Secretary of Health and Human Services (Secretary) that Dolores Wallace was not disabled. The district court concluded that the factual findings made by the Administrative Law Judge (ALJ) were supported by substantial evidence,[1] and this appeal followed pursuant to 28 U.S.C. § 1291. For the reasons stated, we will vacate the district court judgment and remand for further proceedings.

## I

Dolores Wallace is a fifty-four year old high school graduate who worked as a record labeller and inspector for Columbia Records for approximately 9 years. In early November 1978 she ceased working because of a back injury and has not worked since. In the course of explaining her duties as an inspector, Wallace testified that the records passed her station on a conveyor belt and she lifted and pushed stacks of records weighing up to 25 lbs. Her functions were to look for records that were warped, scratched, or improperly labelled and to discard defective records. Tr. at 46–47, 76–79, 87. In addition she had to read computer cards, place records in proper jackets, and write basic data on computer cards such as her name, number of records, and type of defect. Tr. at 65, 87. She was placed on the job after only "a couple of hours" of training. Tr. at 13, 88. She inspected over 2800 records per day, and noted that her fingers were constantly moving all day. Tr. at 12. She stated that she always had to keep up with the records and this put a strain on her because if she fell behind she would be forced to work "extra hard" to fulfill her quota. Tr. at 87. Regarding her

1. Procedurally, this case is somewhat complex. On April 10, 1980 Wallace filed an application asserting disability since Nov. 4, 1978. The application was denied both initially and on reconsideration. Thereafter, Wallace filed a request for a hearing which was held on May 7, 1981. After considering the case de novo, the Administrative Law Judge (ALJ) affirmed the Secretary's decision on June 2, 1981. Upon review, the Appeals Council vacated the decision of the ALJ and remanded the case to obtain testimony from a vocational expert regarding the transferability of Wallace's work skills to skilled or semi-skilled work within her residual functional capacity. Tr. at 21–23. After rehearing before the same ALJ, application was again denied on June 15, 1982. The ALJ concluded that while Wallace was unable to perform her former work, she retained the residual functional capacity for sedentary work. Applying Reg. 404.1569, Rule 200.00(a) and Rule 201.15, Table No. 1, App. 2, Subpart P, Reg. No. 4, the ALJ found her not disabled. That decision became the final decision of the Secretary when it was approved by the Appeals Council on March 10, 1982.

physical condition, Wallace testified that she did light housework and drove an automobile when her back was not bothering her. She stated that she could take care of her own needs, but was unable to tolerate stress.

The medical evidence indicates that Wallace suffered from severe lower back pain in November 1978 and was discharged after a six day hospitalization with a diagnosis of acute lumbar strain and sprain. Subsequently, she was treated by Dr. Kaufman who concluded that in 1979 she was neurologically intact and that while there was occasional exacerbation of her condition, she was not totally disabled. Tr. at 156–62 (Report of 12/21/79). In July 1980, Wallace was evaluated by Dr. Heist who concluded that orthopedically she could perform substantial gainful activity which did not require strenuous activity. Tr. 165. In November 1980, Dr. Kaufman submitted another report which suggested that Wallace's chronic back problems resulted in disability because she was unable to obtain work light enough not to aggravate her problem. Tr. 171. In December 1980, however, Dr. Obade concluded from his examination of Wallace that she was a candidate for sedentary work. Tr. 122–23. In April 1981 Wallace was again seen by Dr. Kaufman who concluded that because of her recurrent orthopedic problems and "hives" she was unable to work. In the spring of 1981, Dr. Sibert, a psychiatrist, evaluated Wallace and concluded that as a result of her physical problems in conjunction with her psychological disorder, "[a]t the present time, this individual is not capable of gainful employment in an open, competitive labor market." Tr. at 202.

Dr. Rubin, a vocational expert called by the ALJ, classified Wallace's former work as a record labeller as unskilled, but determined that the job as a record inspector was semi-skilled. He also opined that the job imparted transferable skills. Based upon the ALJ's hypothetical questions, the expert concluded that Wallace had the vo-

cational background to perform various types of sedentary work activities such as those of a mail order taker or bench inspector.

After considering this testimony at the second hearing, the ALJ found essentially that:

1) Wallace was closely approaching advanced age within the meaning of Reg. 404.1563;

2) her high school diploma does not provide entry into skilled work;

3) medical evidence established that she had lower back syndrome which was amenable to control with medication and avoidance of highly stressful situations and that there was "*no evidence of* any other significant physical or *mental impairment*" . . . Tr. at 17 (emphasis added);

4) there was insufficient evidence of pain of such severity as to preclude performance in all work related activity;

5) she was unable to perform her *former* work;

6) she had the residual functional capacity, within described restrictions, for sedentary work. Reg. 404.1567(a);

7) she had done semi-skilled work in the past and had other work skills which would be transferable to other lighter sedentary jobs. Reg. 404.1568.

Applying the medical-vocational grids to Wallace, the ALJ concluded that 20 C.F.R. 404.1569 and Rule 201.15, Table No. 1 of Appendix 2, Subpart P directed that she be found "not disabled."

## II

An ALJ's findings of fact are conclusive when supported by "substantial evidence."[2] *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983). Nevertheless, this Court has developed cer-

---

**2.** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402

U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). *See also Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981); *Lewis v. Califano,* 616 F.2d 73, 76 (3d Cir.1980).

tain rules to scrutinize the evidentiary basis for administrative findings:

> This oft-cited language [describing the standard of substantial evidence] is not, however, a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion .... The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983) (citations omitted). Having analyzed the evidentiary foundation for the ALJ's conclusions regarding Wallace's non-exertional impairments, we conclude that the ALJ ran afoul of a number of these precepts.[3] As we have previously explained, the process employed to determine whether Wallace is entitled to benefits involves shifting burdens of proof:

> There is a two-pronged test for social security act disability: (1) determination of the extent of disability; and (2) determination whether that impairment results in inability to engage in substantial gainful activity. A claimant satisfies [his or her] initial burden of proof by showing that [he or she] is unable to return to [his or her] customary occupation. *E.g.,*

*Stark v. Weinberger,* 497 F.2d 1092 (7th Cir.1974); *Baker v. Gardner,* 362 F.2d 864 (3d Cir.1966). Once [the claimant] has made such a demonstration, the burden of proof shifts to the Secretary to show that the claimant given [his or her] age, education and work experience, has the capacity to perform specific jobs that exist in the national economy. *E.g., Lewis v. Weinberger,* 541 F.2d 417 (4th Cir. 1976); *Hernandez v. Weinberger,* 493 F.2d 1120 (1st Cir.1974).

*Rossi v. Califano,* 602 F.2d 55, 57 (3d Cir. 1979).

Since the ALJ found that Wallace was unable to return to her former job, the initial hurdle is satisfied. The burden then fell upon the Secretary to show that Wallace, given her overall condition, nevertheless retained sufficient capacity to perform specific jobs existing in the national economy. *Kent v. Schweiker, supra,* 710 F.2d at 114.

Because we believe that the ALJ erred in assessing and analyzing Wallace's non-exertional impairment in connection with her residual functional capacity, we cannot say that the Secretary has met this burden.

### III

As we have noted, the ALJ concluded that the medical evidence established that Wallace's physical impairment was not disabling since she retained the capacity for sedentary work and because no evidence indicated any other significant physical or mental impairment. While the ALJ's evaluation of the evidence of Wallace's physical impairment may be entitled to deference, the unrefuted medical evidence of mental

---

**3.** The Secretary contends that Wallace waived this argument by not presenting it to the Secretary or the district court. The Secretary's brief states that "[n]either the doctors nor her attorney have previously made assertions of non-exertional limitations." Appellee's Br. at 19. The medical reports refute this contention. In addition, both the district court and the ALJ noted the mental impairment, albeit inaccurately; and the effect of the medical impairment was argued to the ALJ by counsel for Wallace. Thus, the Secretary's argument is predicated on an inaccurate view of the facts.

We also note that the proposition that issues should not be heard for the first time on appeal is not jurisdictional in nature. *See Selected Risks Ins. Co. v. Bruno,* 718 F.2d 67, 69 (3d Cir.1983) (citing cases). Thus, even assuming that the non-exertional impairments point was not raised below, this court is able to exercise its "responsibility to scrutinize the entire record and to reverse or remand if the Secretary's decision is not supported by substantial evidence." *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir.1981).

impairment reveals either the wholesale rejection of this evidence or a mischaracterization of its probative value by the ALJ.

The ALJ in his opinion [4] mentions a June 1980 report by Dr. Kaufman which concluded that Wallace is unable to tolerate stressful situations or full-time employment due to a rash and residual back pain.[5] In his initial opinion, the ALJ also noted Wallace's complaint that her prior job caused her to become nervous because of production quotas and that she complained of depression; she stated that she could not cope with stress, "as this causes 'hives.'" Tr. at 32. After reviewing the orthopedic evidence which indicated that Wallace retained the physical capacity to do sedentary work, the ALJ noted Dr. Kaufman's April 1981 report. It concluded, as described by the ALJ, that she was unable to work because of her orthopedic condition and hives.[6] Tr. at 33. In assessing Dr. Sibert's report the ALJ observed:

> On evaluation, claimant was alert, verbal, and oriented. Effect [sic] was appropriate. The claimant exhibited some evidence of depression. There was no evidence of hallucinations, delusions, or other psychotic manifestations. Judgment and memory were normal. The claimant "sat comfortably on her chair for at least 45 minutes for the interview plus a 15 minute wait in the waiting room. Dr. Sibert concluded that the claimant was disabled 30% due to psychiatric disability."

*Id.* The ALJ thereby reasoned that Wallace retained the capacity, on a "physical basis," for sedentary work. Then focusing on the claimed psychiatric problems, the ALJ reasoned:

> Emotionally, the record indicates that claimant suffers from periodic episodes of anxiety. However, current psychiatric evaluation reveals no evidence of gross emotional dysfunction or abnormality. In point of fact, Dr. Sibert concluded that "the psychiatric picture per se does not preclude employment, neither does the orthopedic disability." While Dr. Sibert did not find any evidence of malingering, he noted that there was "no incentive for this woman to go back to work."

Tr. at 35. The ALJ found that no combination of impairments would preclude the performance of sedentary substantial gainful activity. Tr. at 36; tr. at 16 (2d opinion).

Our review of the medical evidence of psychiatric impairment persuades us that the ALJ mischaracterized the import of Dr. Sibert's opinion. According to that opinion, Wallace was unable to perform any substantial gainful activity.[7] Dr. Kaufman's April 1981 report also supports this conclusion. No conflicting medical opinions were submitted regarding the psychiatric component of disability. The ALJ therefore erred in ignoring this evidence in favor of his own conclusion that there was no evidence of significant mental impairment. Tr. at 17, 36.

Recently, this Court reversed an ALJ who ignored competent medical evidence regard-

---

**4.** The ALJ specifically incorporated his prior decision into the text of the final decision of January 15, 1982.

**5.** There is no evidence of this report in the record. Perhaps the ALJ is referring to the April 1981 report by Dr. Kaufman which offers this assessment of Wallace's condition.

**6.** The ALJ conspicuously omits Dr. Kaufman's opinion that the hives may be caused by her nervous condition.

**7.** Dr. Sibert's report reads as follows:

Therefore, from a psychiatric standpoint, it would be my professional opinion that the patient's current clinical psychiatric profile would warrant a 30% psychiatric disability. This disability has not stabilized and the patient is in need of psychiatric care. Final determination of any permanent disability should be postponed until appropriate care has been provided.

At the present time, this individual is not capable of gainful employment on an open, competitive labor market. Continued medical care will be required to assure a return to the labor market. Hence, the patient must be viewed as temporarily unemployable pending final outcome of medical management.

The district court's review of the psychiatric evidence is confined to the one-line notation that Dr. Sibert found Wallace 30% disabled due to psychiatric impairment.

ing psychological disability in favor of his own contrary conclusion. *Van Horn v. Schweiker,* 717 F.2d 871 (3d Cir.1983). The *Van Horn* Court noted that it has "repeatedly [been] held that 'an ALJ is not free to set his own expertise against that of physicians who present competent medical evidence.'" 717 F.2d at 874 (quoting *Fowler v. Califano,* 596 F.2d 600, 603 (3d Cir. 1979)). *See also Kelly v. Railroad Retirement Board,* 625 F.2d 486, 494 (3d Cir.1980) ("An ALJ may not reject professional medical evidence on the basis of his own observation.") Because the ALJ either misread the report of Dr. Sibert or rejected his medical conclusion without explaining his reasons for doing so, the matter must be remanded. *Kent v. Schweiker, supra,* 710 F.2d at 115 n. 5; *Cotter v. Harris,* 642 F.2d 700, 706–707 (3d Cir.1981). The ALJ also rejected an opinion to the same effect by Dr. Kaufman. This runs contrary to the precept that the opinion of Dr. Kaufman, the treating physician, is entitled to substantial weight. *Cotter v. Harris,* 642 F.2d at 704. Accordingly, there is an insufficient evidentiary basis for the finding that mental impairment was insignificant, and thus there may not be substantial evidence for a finding of non-disability.

Moreover, neither the district court nor the ALJ had the benefit of the Supreme Court's decision in *Heckler, etc. v. Campbell,* —— U.S. ——, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983), when making their decisions in this case. In *Heckler,* the Court used this language, *inter alia,* at ——, 103 S.Ct. at 1957:

> [I]n determining whether a claimant can perform less strenuous work, the Secretary must make two determinations. She must assess each claimant's individual abilities and then determine whether jobs exist that a person having the claimant's qualifications could perform. The first inquiry involves a determination of historic facts, and the regulations properly require the Secretary to make these find-

ings on the basis of evidence adduced at a hearing. We note that the regulations afford claimants ample opportunity both to present evidence relating to their own abilities and to offer evidence that the guidelines do not apply to them.

Finally, in evaluating Wallace's residual functional capacity, the ALJ apparently relied solely on the single disability grids. He may have failed to consider the degree of psychological impairment in combination with the physical impairment. Such an inappropriate reliance on the grid regulations to determine the disability of an individual with both exertional and non-exertional impairments would be contrary to *Burnam v. Schweiker,* 682 F.2d 456 (3d Cir.1982).[8]

Even the vocational expert failed to consider the combined effect of physical and mental impairment in concluding that Wallace could perform specific sedentary jobs. Tr. at 97–98. The assumptions contained in the hypotheticals proffered by the ALJ, however, did not accurately portray the nature or extent of Wallace's impairment as contained in the record. *See McGhee v. Harris,* 683 F.2d 256, 259 (8th Cir.1982) ("It is essential that the record clearly indicate that the vocational expert considered the particular individual disabilities of the claimant in evaluating her ability to perform alternative employment."). This in turn renders the vocational expert's testimony deficient. When the expert's attention was focused on Wallace's mental impairments he concluded that she could not perform even sedentary work on a full time basis. Tr. at 102–04.

In view of the numerous defects in this record, the grant of summary judgment for the Secretary must be vacated.

### IV

In addition to our remand for the foregoing reasons, we are troubled by the ALJ's determination that Wallace's prior work was semi-skilled[9] and imparted transfer-

---

8. The boiler-plate language which states that the ALJ considered "any combination of impairments" should not be sufficient to satisfy the requirements of *Burnam* in view of the sequence of the ALJ's findings and his errors in misreading reports. *See Cotter v. Harris,* 642 F.2d at 707 n. 11. *But see Olsen v. Schweiker,* 703 F.2d 751, 754 (3d Cir.1983).

9. 20 C.F.R. § 404.1568(b).

able skills.[10] If the ALJ's decision on either point is incorrect, a finding of disability would be indicated by the regulations. See Rule 201.11 and 201.12, Table No. 1 of Appendix 2, Subpart P.

The vocational expert determined that Wallace's job as a record labeller was unskilled, but that her work as a record inspector was semi-skilled. Her duties as an inspector consisted primarily of visually examining the records for defects in labelling, symmetry or shape. She moved boxes of records along the conveyor belt and documented the type of defect on IBM cards. It required only two hours to learn the job. Based upon this evidence, the vocational expert stated that the job was semiskilled because (a) instruction was necessary (albeit only a few hours of instruction was required), (b) it required that Wallace do a number of things at one time, and (c) it required bimanual dexterity, good vision and judgment. Tr. at 96, 99.

A careful reading of the pertinent regulations, 20 C.F.R. § 404.1568(a) and (b), makes it difficult to classify the job of record inspector as significantly more than unskilled, particularly in view of the minimal time required to become proficient at it.[11] Moreover, even accepting the vocational expert's conclusion that Wallace's prior work involved semi-skilled activities, the related finding of transferability of work skills is also subject to dispute. In describing what transferable skills had been acquired, the vocational expert merely recited basic work traits necessary to most jobs. Tr. at 99, not acquired vocationally significant work activities. However, we note that "[i]t is the acquired capacity to perform work activities with facility (rather than the traits themselves) that gives rise

to potentially transferable skills." Social Security Ruling 82–41 at § 2(d). See also, 20 C.F.R. § 404.1565(a). If aptitudes common to most people are equated with the "substantial vocational asset" of transferable work skills, there would be in essence no distinction between unskilled and semi-skilled individuals for purposes of transferability. Thus, it would appear that the vocational expert's opinion is predicated upon an incorrect application of the Secretary's own ruling.

We express no view on the ultimate merit of Wallace's claims in this regard. We note, however, that considering her age, her non-exertional impairment and her capacity for only sedentary work, see Social Security Ruling 82–41 at § 4(a) and (b), transferability of even the limited work skills she may possess would appear to be insignificant. See id. at § 2(d) ("when job activities are at this minimal level of skill . . . the worker has very little vocational advantage over an unskilled person and does not have transferable skills.").

Accordingly, the February 8, 1983, district court order will be vacated, and the case will be remanded for further proceedings consistent with this opinion.

---

10. 20 C.F.R. § 404.1568(d).

11. See Social Security Ruling 82–41 at § 2(d). Section 2(c) states: "[U]nskilled occupations are the least complex types of work. Jobs are unskilled when persons can usually learn to do them in 30 days or less." Similar occupations are classified by the Dept. of Labor as requiring minimal aptitude and training time. See Dictionary of Occupational Titles § 559.687–074

(Inspector—Hand Packages of Plastic Products). The record also indicates some confusion on the part of the ALJ regarding the effect of finding that Wallace's prior work was unskilled. Tr. at 96. Apparently, the ALJ believed that non-disability could be found despite a finding that Wallace's prior work was unskilled. This runs directly counter to Reg. 201.12, Table No. 1 of Appendix 2, Subpart P.