**Joseph McADAMS, Petitioner,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,
Respondent.**

**Civ. A. No. 85–3390.**

United States District Court,
D. New Jersey.

Dec. 11, 1989.

**580**

Judith A. Bielen, Delran, N.J., for petitioner.

Samuel A. Alito, Jr., U.S. Atty., Newark, N.J. by Donald M. Harris, Sp. Asst. U.S. Atty., for respondent.

## OPINION

COHEN, Senior District Judge:

Plaintiff, Joseph T. McAdams, brings this action under section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Secretary of Health and Human Services' ("Secretary") final determination establishing the onset date of plaintiff's disability for purposes of awarding disability insurance benefits.

Plaintiff initially filed an application for a period of disability and disability insurance benefits under sections 216(i) and 223 of the Act, 42 U.S.C. §§ 416(i) and 423, on June 21, 1984, asserting therein a disability due to "recurring emboli—blood clots," with an alleged onset date of February 11, 1984. Administrative Record at 54 (hereinafter "Record"). The application was denied initially and upon request for reconsideration. Thereafter, plaintiff timely requested an administrative hearing on his application. A hearing was held on February 5, 1985, and on March 6, the Administrative Law Judge ("ALJ") affirmed denial of benefits, holding plaintiff was not disabled. This decision of the ALJ was in turn affirmed by the Appeals Council on June 10, 1985, thereby becoming a final decision of the Secretary.

Plaintiff commenced this civil action on July 11, 1985, challenging the Secretary's determination. The parties' initial foray into this forum culminated in a Consent Order entered January 6, 1986, which remanded the matter to the Secretary for reconsideration in light of plaintiff's additional *mental* impairments. On April 9, 1986, the Appeals Council vacated its earlier denial of plaintiff's request for review and remanded the case to an ALJ for consideration of plaintiff's impairments in light of revised rules for determining disability due to mental disorders, and to consider the transferability of plaintiff's acquired work skills. Record at 371–72. A supplemental hearing for these purposes was held before an ALJ on August 8, 1986.

Meanwhile, on June 26, 1985, plaintiff had filed a second, duplicative application for disability insurance benefits, again alleging disability due to "blood clots in system." Record at 407. This second application was ultimately granted June 3, 1986, on the basis of combined mental and physical impairments but with an "unfavorable onset," Record at 497; for procedural reasons plaintiff's entitlement to benefits pursuant to the second application was limited to a July 1, 1985 onset date. Hence, plaintiff's initial application remained viable with respect to the period from February 1984 to July 1985.

On September 25, 1986, the ALJ issued a recommended decision, regarding the initial application, awarding plaintiff disability benefits, with an onset date of February 14, 1984. Record at 313. Upon notice and an opportunity to be heard, the Appeals Council issued a decision on June 11, 1987, modifying the ALJ's recommended determination by establishing a later onset date of December 20, 1984. Record at 285. This modified determination became the final decision of the Secretary.

By Consent Order filed March 24, 1988, this civil action was reopened for a review of these supplemental administrative proceedings.

Plaintiff is a fifty-five year old male with a tenth grade education. He was previously employed for some seventeen years in the textile industry. In 1969 plaintiff left the textile field and became a liquor store clerk in the Pennsylvania State Store system, a position he occupied until 1981. During this period, plaintiff also operated a variety store business in Philadelphia, which he later turned over to his son. From 1981 until 1984, plaintiff worked as a casino cashier in Atlantic City. He last engaged in substantial gainful employment on February 11, 1984.

Plaintiff first developed significant medical problems in October of 1983, at which time he spent ten days in Temple University Hospital, suffering from vague pleuritic chest pain. While no definite diagnosis

was made despite extensive testing, his condition was believed to represent a pleurodynia secondary to Coxsackie viral infection. Plaintiff also presented abnormal liver function, but this was believed secondary to his lung infection. Record at 103.

On February 14, 1984, plaintiff was again hospitalized, this time at Einstein Medical Center, for work-up of his recurrent pneumonic symptoms. He was discharged on February 24, with a diagnosis of right lower lobe pneumonia with effusions and reactive adenopathy. Record at 129.

Just two weeks later, on March 9, plaintiff was readmitted to Einstein for further evaluation. He remained hospitalized there for over a month. A week into this hospitalization, pulmonary angiography revealed that plaintiff suffered from massive bilateral pulmonary emboli. An immediate attempt was made to dissolve the clots with the use of an anticoagulant, Streptokinase. Following administration of Streptokinase, plaintiff was observed to experience a "transient period of unresponsiveness." Record at 145. Streptokinase proved ineffective in dissolving the clots and plaintiff's doctors performed a partial embolectomy, removing large clots from both right and left pulmonary arteries. Additional clots remained visible angiographically, however, and a Greenfield filter was inserted below plaintiff's renal veins. At this time plaintiff was transferred to the hospital's intensive care unit where he remained for the next week. Record at 145. The following day plaintiff was noted to have a left hemiparesis. A CT scan of plaintiff's brain revealed an "acute hemorrhagic infarct in the distribution of the right middle cerebral artery." Record at 179. On his discharge April 12, 1984, plaintiff's condition was characterized with a four prong diagnosis:

(1) status post massive bilateral pulmonary emboli;

(2) right intracerebral hemorrhage with resolving left hemiparesis;

(3) deep vein thrombosis of the right lower extremity; and

(4) depression.

Record at 146.

Nine days after this discharge, plaintiff was readmitted to Einstein yet again, this time experiencing left leg pain and edema. Following an eighteen day hospitalization plaintiff was discharged on May 9, 1984, with another similar compound diagnosis:

(1) deep venous thrombosis and thrombophlebitis;

(2) status post pulmonary emboli; and

(3) intracerebral hemorrhage.

Record at 215.

Though he remained on medication and was required to wear an elastic leg support garment, plaintiff's physical condition gradually improved over the ensuing months. A cardiac status evaluation performed at the request of the Secretary by Dr. Ronald C. Gove, M.D., on August 6, 1984, suggested that, despite fleeting chest pain in the treadmill evaluation, plaintiff was "[n]ondiagnostic for coronary artery disease," Record at 245, and therefore arguably not disabled from an exertional standpoint as of that date.

Plaintiff's physical debilities, however, have been accompanied by a psychological impairment overlay which appears to have progressed in severity over time. During plaintiff's March–April 1984 hospitalization a psychiatric consult was obtained from a Dr. Bell, resulting in a diagnosis of depression. Record at 146. During his next and last hospitalization, in April–May 1984, Dr. Bell saw plaintiff again and provided follow-up supportive psychiatric therapy. Plaintiff was again noted to be experiencing depression, Record at 222, but otherwise was reportedly oriented, with memory and judgment intact. Record at 221.

However, shortly thereafter, on June 21, 1984, in connection with plaintiff's initial disability application, a Social Security interviewer observed that plaintiff "rambled on and on about his ailment. Sometimes [plaintiff's] thoughts seemed disconnected. He was depressed and anxious about his illness." Record at 86.

In a disability determination exam performed on July 9, 1984, plaintiff's treating physician, Dr. Harvey L. Azarva, M.D., characterized his psychological condition as one of "extreme anxiety/depressive reaction to illness." Record at 241.

On August 13, 1984, Dr. Paul Saraduke, M.D., performed a psychiatric evaluation of plaintiff at the request of New Jersey Department of Labor, Division of Disability Determinations. Dr. Saraduke described plaintiff as "alert, rational and well oriented in all spheres. His attitude is open, sincere and cooperative.... No signs of psychosis, organicity or clinical depression. Affect is mildly depressed. Judgment intact." Record at 258. Elsewhere in his one-page report, however, Dr. Saraduke noted that plaintiff was "fearful that he will get worse clots ... [and] very frightened by the various medical-surgical procedures that were done." Dr. Saraduke further observed plaintiff: "[t]earfully ... tell[ ] me how his life has been pulled apart and his savings depleted." Plaintiff is also quoted in the report as claiming "I have nothing to do," and "I just feel lost." Dr. Saraduke noted too that plaintiff was "pessimistic about his future." Ultimately, Dr. Saraduke described plaintiff's condition as "atypical depression," but expressly made no psychiatric recommendations. Record at 258.

Shortly after Dr. Saraduke's evaluation, in a Reconsideration Disability Report dated September 6, 1984, plaintiff's Social Security interviewer noted that he "ramble[d] on during interview about his depression and all kinds of unrelated topics." Record at 97.

Plaintiff's next psychiatric evaluation was on December 20, 1984, at the request of his attorney, by Dr. Edward H. Tobe, D.O., a psychiatric specialist. Dr. Tobe noted that plaintiff "initially came across as a very bright, spontaneous man." Record at 265. However, over the extended course of this interview, Dr. Tobe further observed "a marked scattering of subjects that clearly depicted looseness of associations with serious questions about delusional formation." Record at 265. Additionally, plaintiff revealed to Dr. Tobe that he had been hospitalized for depression at age 30 and at that time had received electro-shock therapy. Dr. Tobe concluded his report with the following psychiatric assessment:

> Essentially, I am describing a very disturbed man with a history of depression. There is [a] question of whether or not he is suffering with recurrent unipolar depressive disorder, as contrasted with a schizophrenic disorder. The looseness of associations, the unmodulating affect would make me consider a schizophrenic disorder; but there is clearly a very serious depressive disorder present at the same time. Thus, the diagnosis at this point would be best considered a schizo-affective disorder, depressed. He is psychotic at this time due to the profound detachment from what is real.

Record at 266. Dr. Tobe's diagnosis was subsequently borne out by later psychological evaluations.[1] It is uncontested that plaintiff was disabled within the meaning of the Act from and after December 20, 1984, due exclusively to this mental impairment, without regard to his physical impairments.

In January 1985, plaintiff's treating physician, Dr. Azarva, prepared a report (at the request of plaintiff's attorney) retrospectively assessing plaintiff's condition over the preceding twelve months. Dr. Azarva revealed that he had continued to treat plaintiff on an outpatient basis on five occasions since plaintiff's last hospital-

---

1. Dr. Marvin Lieberman, E.D.M., diagnosed plaintiff on April 12, 1986 as having a paranoid schizophrenic personality with suicidal tendencies. Record at 400. Four days later, Dr. Stuart Zuckerman, D.O., rendered a substantially similar diagnosis of schizo-affective disorder and paranoid personality disorder. Record at 406, 474.

Perhaps significant in this regard, plaintiff was again evaluated by Dr. Saraduke in March, 1986. While noting that plaintiff seemed "to have deteriorated some" since the initial August 1984 evaluation, Dr. Saraduke's diagnosis re-

ization in May 1984.[2] On these occasions plaintiff complained of "frequent bouts of anxiety and depression." Record at 272. On several of his office visits, plaintiff further admitted to being "very nervous and suspicious regarding the activities of various members of his family." Record at 272. Dr. Azarva described these fears as at times bordering on the paranoid. Dr. Azarva concurred in the psychiatric assessment of Dr. Tobe and concluded that plaintiff had been disabled from gainful employment over the previous year for both medical and psychological reasons. Indeed, Dr. Azarva cautioned: "it is quite apparent to me that it would be unreasonable for him, *and medically risky*, to attempt to resume competitive employment." Record at 272 (emphasis added).

Reports of Contact with members of plaintiff's family offer additional lay insights into plaintiff's emotional condition during the disputed time period. In a Report of Contact dated May 23, 1986, plaintiff's wife is noted to have claimed:

> She doesn't know what happened to him. He was a hard worker very attentive to her, loved his family & now he is different—hardly speaks or associates with the family—very very little.

Record at 495. In the same Report, plaintiff's wife traced this behavioral change to two years before and characterized it as one "from night to day." Record at 495.

Similarly, in a January 16, 1986 Report of Contact with plaintiff's adult daughter (who was living with her parents), she too stated that his personality had changed about two years earlier, "[s]ince he came out of hospital." Record at 466. The Report goes on to state: "The daughter says mother feels the man [plaintiff] went into hospital & got a different man back for a husband." Record at 467.

The ALJ in his recommended decision concluded that:

> a combination of impairments, including hospitalizations and treatment for pneumonia, pulmonary emboli and thrombo-

phlebitis (sic), along with evidence of extreme anxiety and depression combined to prevent the claimant from performing all work activity from February 14, 1984 until December 20, 1984 when the psychiatric evidence of record clearly indicates that the severity of the claimant's emotional disorder met the requirements enumerated in Section 12.03 of the Secretary's Listing of Impairments.

Record at 310 (citations to exhibits omitted). For the period preceding December 20, 1984, the ALJ based his assessment of plaintiff's combined impairments "upon a framework finding keyed to an individual closely approaching advanced age with a limited education and *un* transferable work skills." Record at 311 (emphasis added). Although the ALJ found plaintiff exertionally capable of performing light work, he determined that plaintiff's non-exertional impairments rendered him incapable of performing "work requiring association or relation with other people, concentration, maintaining attention span, paying attention to details and completing tasks." Record at 312.

The ALJ expressly found plaintiff's testimony to be credible. Moreover, the ALJ noted that plaintiff's "outstanding work record and the medical evidence" were further supportive of his credibility. Record at 312. Indeed, the ALJ maintained: "I believe that Mr. McAdams would be working if he felt at all capable of so doing, and I have no reason to question his truthfulness as a witness." Record at 310.

The ALJ accorded "little probative value" to the psychiatric evaluation of Dr. Saraduke, finding it to be: (1) based on "only a very 'brief' examination"; (2) refuted by the reports of treating physicians; and (3) inconsistent with later psychiatric examinations. Record at 310. Thus, the ALJ concluded, "[i]t appears that Dr. Saraduke's report and findings are inconsistent with the entire evidence of record, especially that pertaining to the period of time

---

mained unchanged: atypical depression. Record at 470.

2. Medical records of these office visits do not appear as part of the Administrative Record certified to this court.

from February 1984 through July 1985." Record at 311.

The Appeals Council concurred in the ALJ's determination that plaintiff's non-exertional impairments had reached listing severity, and rendered him disabled on that basis, as of Dr. Tobe's December 20, 1984 examination. The Appeals Council reversed the decision of the ALJ, however, with respect to the preceding period from February to December of 1984.

Over this earlier period, the Appeals Council found plaintiff to have been "capable of sedentary work activity, less those jobs involving high amounts of interpersonal stress." Record at 280. In concluding that plaintiff was not disabled during the February to December 1984 period, the Appeals Council relied upon the framework of Rule 201.11 of Appendix 2 to Subpart P of Social Security Administration Regulations No. 4, 20 C.F.R. § 404.1520(f). Record at 280. Rule 201.11, in contrast to the ALJ's finding, is based upon an individual with *transferable* work skills.

The Appeals Council modified the ALJ's credibility determination accordingly, finding plaintiff's testimony to be credible only insofar as it was consistent with the Council's conclusions. Record at 285.

The Appeals Council further departed from the recommended decision of the ALJ as to the probative value to be accorded the August 1984 psychiatric evaluation by Dr. Saraduke. The Appeals Council found Dr. Saraduke's report to be "consistent with earlier evidence"; consistent with aspects of Dr. Tobe's December 1984 examination; and consistent with later evidence purportedly suggestive of malingering. Record at 284. The Appeals Council discounted the contradictory evidence offered by plaintiff's treating physician, Dr. Azarva, largely because of his failure to supply "clinical details" of plaintiff's emotional impairments. Record at 282. The Appeals Council also implicitly recognized a measure of deference to Dr. Saraduke's psychiatric specialization, in reconciling his report with the discrepant conclusions of Dr. Azarva, an internist by specialization.

The Secretary maintains that the Appeals Council's determination that plaintiff was not disabled prior to December 20, 1984 is supported by substantial evidence and, therefore, must be affirmed by this court. Plaintiff's counsel on the other hand argues that the Appeals Council's decision to modify the ALJ's onset determination is *not* supported by substantial evidence; that the Secretary employed erroneous legal standards in evaluating the evidence; and that the onset determination of the ALJ (viz., February 14, 1984) *is* supported by substantial evidence and should be reinstated by this Court in the form of definitive relief.

Reordering the sequence of these issues somewhat, it is the task of this court to determine: (1) whether the Secretary employed the correct legal standards in reaching its decision; (2) whether, after allowing for any errors of law, the determination of the Secretary is supported by substantial evidence; and finally (3) if the Secretary's onset determination is *not* supported by substantial evidence, whether the appropriate relief is a remand for further proceedings or the award of definitive relief.

Initially, however, it is necessary to take note of the established legal principles which govern the court's disposition of these issues. The Secretary's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla. It such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (Frankfurter, J.)). The inquiry is not whether the court would have reached the same conclusion; substantial evidence may thus be less than a preponderance of the evidence. *Hanusiewicz v. Bowen*, 678 F.Supp. 474, 476 (D.N.J.1988). However, the reviewing court is under a duty to read the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir.1984). In this review, "a court must

'take into account whatever in the record fairly detracts from its weight.'" *Willbanks v. Secretary of Health and Human Services*, 847 F.2d 301, 303 (6th Cir.1988) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951) (Frankfurter, J.)). The Secretary is under a corresponding duty to facilitate the court's review: "Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F.Supp. 273, 278 (M.D.Pa.1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir.1986)). Access to the Secretary's reasoning is indeed essential to meaningful court review:

> Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir.1978).

In keeping with these principles, "[a] single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion...." *Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150, 1153 (3d Cir.1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983) (citations omitted)).

Further, the Secretary must be especially circumspect "about disregarding the opinions of attending physicians, particularly 'when the opinion reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987) (quoting *Po-*

*deworny v. Harris*, 745 F.2d 210, 217 (3d Cir.1984)). Similarly, the Secretary may not substitute its own conclusions where contradicted by competent medical evidence of psychological disability. *Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150, 1154–55 (3d Cir.1983). See *Woody v. Secretary of Health and Human Services*, 859 F.2d 1156, 1160–62 (3d Cir.1988). The Third Circuit has made clear that "[i]n cases of alleged psychological disability, such lay observation [by an administrative judge] is entitled to little or no weight." *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir.1983) (quoting *Kelly v. Railroad Retirement Bd.*, 625 F.2d 486, 494 (3d Cir.1980) (bracketed portions in original)).

■ Where factual findings by an Appeals Council conflict with those of the ALJ, the reviewing court must defer to the findings of the Appeals Council. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (en banc). However, especially where credibility is a significant factor in assessing the existence of substantial evidence, the Appeals Council should not lightly discard "invaluable" firsthand insights of the ALJ. *Willbanks v. Secretary of Health and Human Services*, 847 F.2d 301, 303–04 (6th Cir.1988).

■ Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Secretary arrived at its decision by application of the proper legal standards. *Curtin v. Harris*, 508 F.Supp. 791, 793 (D.N.J.1981); *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir.1983) (per curiam).

The Act defines "disability" for purposes of plaintiff's entitlement to disability insurance benefits as the: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A).[3] Under this defini-

---

**3.** The court notes that severe but *unrelated* im-

pairments may not be combined to satisfy this

tion, a claimant qualifies as disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). "Substantial gainful activity" is defined as "work that—(a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. Importantly, this definition presupposes a regular, continuing and sustained ability to perform such work. *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987) (and cases cited therein).

■ The Act further mandates that "the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity [as to form the basis for disability benefit eligibility]." 42 U.S.C. § 423(d)(2)(C). Accordingly, the Secretary is obligated to account for the combined effect of exertional and non-exertional impairments. *Burnam v. Schweiker*, 682 F.2d 456, 457–58 (3d Cir.1982). Similarly, where an emerging mental impairment overlaps in time with a triggering but diminishing physical impairment, "the combined effect of the impairments should be considered to the extent it might bear on the onset date of disability." *Lichter v. Bowen*, 814 F.2d 430, 436 (7th Cir.1987).

Determining whether a claimant is entitled to disability benefits involves shifting burdens of proof. *Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150, 1153 (3d Cir.1983). "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Secretary to prove that there is some other kind of substantial gainful employment he is able to perform." *Kangas v. Bowen*, 823

F.2d 775, 777 (3d Cir.1987). This secondary inquiry demands an assessment of the claimant's residual functional capacity, defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Appendix 2 to Subpart P, § 200.00(c). The claimant's age, education and work experience must also be factored into this inquiry. *Id.* Where both exertional and non-exertional impairments are implicated, the rules embodied in the tables (frequently referred to as "grids") of Appendix 2 to Subpart P, provide a "framework" for analysis but cannot wholly determine the disability inquiry. *Id.* at § 200.00(e)(2).

■ In the present case, the crucial question involves not *whether* plaintiff became disabled but rather *when* he reached this condition. The task of this court in reviewing the Secretary's onset determination is "whether the chosen onset date is supported by substantial evidence, not whether an earlier date could have been supported." *Swanson v. Secretary of Health and Human Services*, 763 F.2d 1061, 1065 (9th Cir.1985). Of course, "it is not the beginning of a condition which determines eligibility of disability benefits but rather only when and if it reaches a point that it precludes all substantial gainful activity." *Ogden v. Bowen*, 677 F.Supp. 273 (M.D.Pa.1987). In the case of progressive mental impairments, the disabling condition "does not arise full grown on the day the patient sees the doctor." *McWilliams v. Bowen*, 674 F.Supp. 12, 13 (W.D.Pa.1987). In light of this fact, it bears emphasis that "the critical date is the date of *onset* of disability, *not* the date of diagnosis." *Swanson v. Secretary of Health and Human Services*, 763 F.2d 1061, 1065 (9th Cir.1985) (emphasis in original). *See Kiscaden v. Bowen*, 663 F.Supp. 5 (E.D.Pa.1986) (Pollak, J.).

durational requirement where neither impairment alone is expected to last for at least twelve months. 20 C.F.R. § 404.1522(a). In the present case, however, the record reflects an understanding that plaintiff's mental impairment is in large part attributable to the emotion-

al trauma of his physical illness, if not a direct consequence of his acute brain hemorrhage. Plaintiff's physical and mental impairments are therefore 'related' for purposes of § 423(d)(1)(A)'s durational requirement.

The Secretary has promulgated Social Security Ruling 83–20 setting forth the guidelines which govern the determination of onset of disability. Social Security Rulings are binding on all components of the Social Security Administration. 20 C.F.R. § 422.408. *See Heckler v. Edwards*, 465 U.S. 870, 873 n. 3, 104 S.Ct. 1532, 1534–35 n. 3, 79 L.Ed.2d 878 (1984). Social Security Ruling ("SSR") 83–20 mandates that "[t]he starting point in determining the date of onset of disability is the individual's statement as to when disability began." *Id.* at 96. "[T]he date alleged by the individual should be used if it is consistent with all the evidence available." *Id.* at 97. While "[t]he medical evidence serves as the primary element in the onset determination," *id.* at 96, a claimant's work history and, where necessary, information from family members, are also important factors in establishing disability onset. *Id.* at 95–98.

Having set out at some length the legal principles which guide its review, this court notes the numerous and highly consequential errors committed by the Secretary in this case.

First, the Appeals Counsel altogether failed to employ SSR 83–20 guidelines in reaching its onset determination. Moreover, the Appeals Council's choice of the date of *diagnosis* of plaintiff's psychosis does not comport with a proper inquiry into disability onset, as outlined in SSR 83–20 and the cases cited previously herein.

Second, in light of plaintiff's combined exertional and non-exertional impairments, the Council appears to have assigned inordinate, even determinative, weight to the "grid" analysis. Moreover, its use of a "transferable" work skills finding in this analysis was the self-fulfilling product of a conclusory hypothetical posed to the vocational expert. *See* Record at 345–49.

Third, the "stress" limitation embodied in that hypothetical finds no basis in the credible evidence of record. Its source appears to be the August 1985 evaluation of plain-tiff by Dr. Kelly Reid, M.D. *See* Record at 462–63. Therein, Dr. Reid relates plaintiff's complaints about "stress," but far from endorsing their validity, finds plaintiff's thought process "somewhat contrived" and suggests plaintiff is a malingerer. Coming some eight months after the parties agree plaintiff had clearly become psychotic, Dr. Reid's evaluation is overwhelmed by the contrary evidence and lacks credence. Even assuming *arguendo*, that Dr. Reid's report suggests that plaintiff was suffering from a "stress" limitation, no reasonable construction of the evidence as a whole suggests that this was plaintiff's *sole* non-exertional impairment.[4] Accordingly, the Appeals Council's conclusory holding that plaintiff's "non-exertional residual functional capacity was unlimited, except for work involving excessive stress," Record at 284, constitutes an impermissible injection of lay psychiatric opinion, contradicted by the competent medical evidence of record.

Fourth, the court is not satisfied with the Appeals Council's attempted refutation of the opinion of plaintiff's treating physician, Dr. Azarva, in favor of the conflicting opinion of Dr. Saraduke. It is the former and not the latter which is consistent with the credible evidence of record. Indeed, Dr. Saraduke's conclusions are in significant respects at odds with his own observations of the plaintiff's behavior. In contrast, Dr. Azarva's opinion reflects a more comprehensive understanding of plaintiff's impairments, gleaned from months of treating him. Dr. Azarva expressly concurred in the assessment of Dr. Tobe, upon whom the Council itself relies. Further, to the extent Dr. Saraduke's opinion is consonant with that of Dr. Reid, suggesting malingering, it is contradicted by the Council's own finding of disability. This court fails to comprehend how the absence of supportive "clinical details" in any way undermines Dr. Azarva's opinion. Indeed, his January 1985 retrospective report on plaintiff's con-

---

**4.** *See, e.g.,* Record at 312 (ALJ finding that plaintiff was incapable of "work requiring association or relation with other people, concentra-tion, maintaining attention span, paying attention to details and completing tasks.")

dition is lucid and carefully reasoned.[5] Lastly, the fact that Dr. Saraduke rendered the same diagnosis of atypical depression, after a March 1986 evaluation of plaintiff, further discredits his opinion.

Fifth, the Appeals Council gave insufficient weight to plaintiff's work history of over thirty years of near-continuous employment. Relatedly, the Appeals Council accorded too little deference to the first hand findings of the ALJ to the effect that plaintiff was credible. *Compare* Record at 310 *with* Record at 285, ¶ 5.

Finally, the Appeals Council failed to apply a proper construction of the substantial gainful activity requirement. Absent from its decision is any recognition that this concept is premised upon a continuing sustainable level of performance. Instead, the Appeals Council appears to have seized on any bits of the record which suggest brief moments of remission from plaintiff's mental impairment and attributed undue weight to them. The Council thereby contravened its duty to assess the evidence as a whole. *See Daring v. Heckler,* 727 F.2d 64, 70 (3d Cir.1984).

In sum, it is the opinion of this court, even on its properly limited review of the proceedings below, that the decision of the Secretary is founded upon an erroneous application of relevant law, and lacking substantial evidentiary support in the record.

▆▆▆ Therefore, the court must now decide whether this case should be remanded to the Secretary for further proceedings, or reversed with directions to award benefits. The Third Circuit decision in *Podeworny v. Harris,* 745 F.2d 210, 221–23 (3d Cir.1984) offers guidance in this inquiry. *Podeworny* reflects a general policy preference in favor of remand for corrective administrative proceedings: "The decision to direct the district court to award benefits should be made only when [1] the administrative record of the case has been fully developed and [2] when substantial evidence on the record as a whole indicates that the claim-

ant is disabled and entitled to benefits." *Id.* at 221–22.

As to the first requirement, this case has already been remanded once for further administrative proceedings. Plaintiff has now waited nearly five and a half years for a final determination of his disability entitlement. The transcript of the administrative record now exceeds 500 pages. If this record is not "fully developed," the responsibility for any deficiencies lies squarely with the Secretary.

As to the second requirement, the court expresses its reluctance to become engaged directly in the weighing and evaluation of evidence. To the extent any ambiguity might be found in this record, however, it is exceedingly narrow. Beyond peradventure, plaintiff was disabled by his physical impairments alone from February 14, 1984 (the date of his hospitalization) until at least mid-summer of that year. Additionally, while the level of plaintiff's physical impairments diminished, the record plainly shows that his mental impairments has progressed to the point that he was rendered disabled on that basis alone sometime prior to December 20, 1984. This court is of the opinion that no reasonable construction of the competent evidence of record can support a finding that plaintiff was *not* disabled by the combined effect of his physical and mental impairments during the intervening period. This conclusion is substantiated by the thoughtful and carefully considered recommendation of the ALJ, who had the greatest opportunity to evaluate the evidence first hand.

Under these circumstances, "[w]here further administrative proceedings would simply prolong [claimant's] waiting and delay his ultimate receipt of benefits, reversal is especially appropriate." *Id.* at 223. More recent decisions of the Third Circuit bear out these *Podeworny* principles. *See, e.g., Woody v. Secretary of Health and Human Services,* 859 F.2d 1156, 1162–63 (3d Cir.1988); *Gilliland v. Heckler,* 786 F.2d

---

5. The court notes that retrospective opinions by medical experts are not only probative but often critical to onset determination analysis. *See*

*Willbanks v. Secretary of Health and Human Services,* 847 F.2d 301 (6th Cir.1988); *Beasley v. Bowen,* 693 F.Supp. 1216, 1221 (D.C.C.1988).

178, 184–85 (3d Cir.1986); *Caffee v. Schweiker*, 752 F.2d 63, 68 (3d Cir.1985).

By way of summary, the Secretary employed erroneous legal standards in reaching its decision in this case. Further, the decision of the Secretary is against the substantial weight of the competent evidence. Even if it were possible for the Secretary to correct the record through additional proceedings, it would be grossly unfair to allow it. Accordingly, this court reverses the decision of the Secretary and directs that plaintiff be awarded benefits reflecting a disability onset date of February 14, 1984.